**E. J. KELLER CO., Inc., v. READING CO.**

No. 4384.

Circuit Court of Appeals, Third Circuit.

April 6, 1931.

Allen S. Olmsted, 2d, and Saul, Ewing, Remick & Saul, all of Philadelphia, Pa., for appellant.

Geo. Gowen Parry and Harold Cooper Roberts, both of Philadelphia, Pa. (White, Parry Schnader & Maris, of Philadelphia, Pa., of counsel), for appellee.

Before DAVIS, Circuit Judge, and THOMSON and WATSON, District Judges.

DAVIS, Circuit Judge.

This was a suit instituted by the Keller Company to recover from the defendant $4,411.47, the value of 287 bales of rags, alleged to have been lost through the negligence of the Reading Company, defendant herein, from a larger lot of 835 bales unloaded on defendant's wharf September 8, 1924,

by the steamship Dania. The negligence alleged was the failure of the defendant to maintain an adequate guard or exercise suficient supervision over its wharf on which the bales were delivered to protect them from being stolen.

The theory upon which the suit was brought was that the defendant was a public warehouseman, and, when the rags were delivered on the wharf or pier, it became a bailee for hire, and as such was responsible for its negligence which resulted in the loss of the rags. The learned trial judge directed a nonsuit on the ground that the plaintiff had not shown a contract with the defendant as to the goods in question and on the further ground that the plaintiff had failed to show negligence on the part of the defendant.

There is no doubt that one who holds himself out as a public wharfinger or warehouseman and invites the public to use his wharf for hire is required to use due care in the protection of the property received by him and is liable for the loss of goods resulting from his negligence. But one of the fundamental questions here is whether or not the evidence shows that the defendant held itself out as a public warehouseman for hire and received and held the rags.

The plaintiff says that the defendant did so hold itself out, and cites as evidence the following portion of paragraph 2 of the complaint which was admitted in the affidavit of defense: "It (the defendant) owns and operates certain piers and wharves in the City of Philadelphia and is likewise a warehouseman and common carrier engaged in interstate and foreign commerce." It further alleged that the defendant owned pier No. 27 North on the Delaware river, and held itself out as willing to receive and store import freight from the public on its pier and published a tariff of charges for such storage. This, as alleged, was denied by the defendant. It stated that it received and stored only import freight from foreign points in transit over its lines to points beyond Philadelphia. This part of the affidavit of defense was also offered in evidence by the plaintiff, and, being in evidence, the court had to give due credit to all the allegations. Kull v. Mastbaum & Fleisher, 269 Pa. 202, 112 A. 631; Buehler v. United States Fashion Plate Co., 269 Pa. 428, 112 A. 632. The tariff referred to follows:

"Freight Received from Foreign Ports.

"Freight received from foreign ports will be held by the Reading Company at owner's

risk free of charge, when in transit via Reading Company to points other than Philadelphia stations (as enumerated in Item No. 1).

"When space on its piers is available, and until such space is needed for other purposes, the Reading Company will hold, free of charge, at owner's risk, freight received from foreign ports, when in transit, for a period not exceeding 15 days, if piece or package freight; and for a period not exceeding 5 days, if bulk freight (excepting iron ore, manganese ore and chrome ore), time to be computed from the first 7 A. M. following the day the vessel completes discharging its cargo, and storage charges, if any, will cease when shipping instructions are furnished carrier. After the expiration of the free time, storage charges will be assessed as follows:

"For the first 10 days, or fraction thereof: 1½ cents per 100 pounds.

"For each succeeding 10 days, or fraction thereof ½ cent per 100 pounds.

"In case shippers desire import freight held, it will be necessary to make arrangements with the Freight Traffic Department of the Reading Company."

The tariff clearly refers to import freight destined to points beyond Philadelphia routed over the defendant's lines, and specifically provides that, in case shippers desire freight to be held by the defendant, it was "necessary to make arrangements with the Freight Traffic Department of the Reading Company." It is admitted that no arrangements were made, or attempted to be made, for the storage of the freight for which plaintiff seeks to recover. The evidence establishes that the plaintiff unloaded the freight on defendant's wharf without notifying it and without making any arrangements whatever for it to remain there. Whether the plaintiff would ever ship any of the rags over the defendant's lines and pay storage for them depended upon future contingencies. If they were sold to persons beyond Philadelphia and were shipped over the Reading lines, the plaintiff would necessarily under the law and provisions of the published tariff pay storage, but, if they were removed by truck from the wharf, the plaintiff would not pay any storage whatever. The freight contemplated by the tariff was freight which the defendant had received and which was in transit, not freight simply left on the pier without notice or agreement. The storage charges provided in the tariff were for freight received for transportation over defendant's lines, not for freight which

had not been received and accepted by it under the arrangements made necessary by its published tariff. Until such freight was delivered to the defendant and arrangements were made for its storage, it was not subject to the tariff. Some 122 of the bales of rags left on the pier were taken away by the plaintiff without the payment of any storage whatever and without the consent or even knowledge of the defendant, and all of the bales here in question could have been so removed, without payment of storage.

■ Some reference was made by counsel at the argument to a suit brought by the defendant against the plaintiff in the common pleas court of Philadelphia county for storage, but the only storage to which that suit referred was storage for the bales received by the defendant and actually shipped over its railroad. This has no bearing on the issue here involved. We do not think that the evidence shows that the defendant was a public wharfinger as to the bales lost so as to make it a bailee for hire. There was no express agreement from which such conclusion can be drawn, nor can it be implied from the evidence as a whole. Consequently, the defendant did not hold itself out expressly or by implication as a public wharfinger or warehouseman.

A shipper may not import merchandise, simply dump it down on a private wharf maintained by a common carrier for the storage of import freight in transit destined to some point over its lines, and thus make it liable as a bailee for hire for the loss of the merchandise without notifying the owner of the wharf of the presence of the freight, and without making some arrangement for its storage as required by its published tariff. No case has been cited as authority for such proposition of law, and it is so manifestly contrary to established principles of justice that we are persuaded that none can be cited.

■ The appellant was notified when the rags were unloaded on September 11, 1924, by the American Baltic Chartering & Shipping Company, agents for the steamship Dania, that, if they were not removed from the pier by 5 o'clock September 15, 1924, it would be compelled to store same at plaintiff's expense or allow them to remain on the pier at its risk without further notice. It did not store them, but allowed them to remain on the pier at plaintiff's risk. Neither did the plaintiff do anything to protect them, but allowed them to remain on the pier unprotected. When the shortage was discovered, the plaintiff applied to the defendant

to make good the loss, but it refused on the ground that it had never received the goods, that any goods belonging to plaintiff on defendant's pier were left there entirely at plaintiff's risk, and that the defendant had not assumed, and would not assume, any responsibility for them. Yet the plaintiff allowed the rags to remain there two years longer without doing anything for their protection. The responsibility of a bailee for hire cannot be thrust upon a person without his knowledge or consent. There must be a delivery to him either actual or constructive. The evidence shows that there was neither as to the rags lost.

As to the negligence charged, the evidence shows that the defendant employed watchmen who were on duty 24 hours a day, maintained gates at the entrance to the pier, excluded unauthorized persons from it, and locked the gates at night. This the defendant did to protect property delivered to it for transportation by rail, but it did not assume responsibility for nor exercise control over other property not so delivered to it, but left on the pier at owner's risk. Over such property during business hours the owner exercised absolute control and did what he pleased with it.

If it can be said that the defendant was in any respect a bailee of property left on the pier, but not delivered to it for transportation over its lines, it was a gratuitous one, and was responsible for gross negligence only. There is no evidence of such negligence here. If there was any such negligence, it was not on the part of the defendant.

The judgment is affirmed.