Robert E. ADAIR, Appellant,

v.

Robert ROBERTS, Appellee.

No. 6784.

Court of Civil Appeals of Texas.

Texarkana.

March 3, 1955.

Spruiell, Lowry, Potter & Lasater, Tyler, for appellant.

Pollard, Reeves & Boulter, Tyler, for appellee.

FANNING, Justice.

Robert E. Adair, as alleged bailee of Ace Oil Company, sued Robert Roberts to recover for the alleged conversion of oil well casing (allegedly belonging to Ace Oil Company) valued at $3,542.23. Roberts denied generally the allegations and pleaded as special defenses that the casing in question was owned by Alcan Oil Company and also pleaded a written general release by Ace Oil Company in favor of Alcan Oil Company (allegedly) of all claims to the pipe in question. Neither Ace Oil Company nor Alcan Oil Company (both corporations and both claiming ownership of the pipe in question) were made parties to the lawsuit. The case was tried to a jury but at the conclusion of plaintiff's evidence the trial court instructed a verdict for the defendant. Appellant Robert E. Adair has appealed from this judgment.

Appellant presents six points wherein he contends (in essence) that the trial court erred (1) in holding that there was insufficient evidence to raise an issue as to whether a bailment contract existed between Ace Oil Company and Adair as bailee of the casing in question and therefore Adair could not recover as plaintiff; (2) and (4) in sustaining defendant's objections to certain testimony; (3) in refusing to allow plaintiff to reopen the evidence; (5) in holding that there was insufficient evidence to raise a question of fact as to whether defendant converted the casing in question; and (6) in holding that there was insufficient evidence to raise an issue of fact with reference to the value of the casing in question.

The controlling question involved here is the question of bailment as plaintiff Adair sought to recover against defendant Roberts on the theory that he, Adair, was the bailee of Ace Oil Company, and was therefore entitled to sue Roberts for the alleged conversion of the pipe. If the evidence was insufficient to raise the issue as to whether Adair was the bailee of Ace Oil Company *at the time of the alleged conversion of the pipe in question,* then Adair could not recover against Roberts, irrespective of the merits of the question as to whether the pipe actually belonged to Ace Oil Company or to Alcan Oil Company.

Ace Oil Company (hereinafter referred to as Ace) entered into a written contract with Alcan Oil Company (hereinafter referred to as Alcan) in November 1952, to drill several wells, which contract recites a prior debt of $25,000 owing by Alcan to Ace, and recites the agreement of Ace to drill wells requested by Alcan at the rate of $21,000 for each well drilled, completed and equipped with casing, etc., and at the rate of $7,150 for each dry hole not completed by installing casing with certain other enumerated charges. Roberts, President of Alcan, owned 95% of the Alcan stock and represented Alcan in these transactions. Ace subcontracted the drilling to Smackover Drilling Company, a corporation owned by Recknagel and appellant Adair to which Roberts or Alcan had no objection. Emma Thorne No. 1 Well was completed as a dry hole and the casing involved in this suit was laid on the ground near the well but was never installed in the well. Other wells were drilled on the contract. On January 30, 1953, Ace (and Potter as Trustee) in consideration of the sum of $73,706.20, executed a general written release in favor of Alcan, which release recites in part as follows:

" * * * do hereby Remise, Release and Forever Discharge the said Alcan Oil Company, its successors and assigns, of and from all debts, claims, demands, obligations, actions, causes of action, sum or sums of money, accounts, and contracts of every kind and character which we or either of us can, shall or may have for or by reason of any matter, cause or things, including, but not being limited to the matters or things mentioned in said deed of trust, to the date of these presents.

Witness Our Hands this 30th day of January, 1953."

Roberts testified that Alcan was supposed to have received the casing in question for said consideration and it was his position that under the terms of the general release that the casing belonged to Alcan. Roberts further testified that in late January or early February 1953, he, as President of Alcan, directed that the pipe in question be moved from its location at the pumper's house of Alcan and that it was moved and sold under claim of ownership by Alcan. Under the testimony of Davis, Vice-President of Ace, it was the contention of Davis that the casing in question was the property of Ace, remained the property of Ace, and was not intended to be released or conveyed in the general release to Alcan.

Mr. Davis, Vice-President of Ace, testified that after the Emma Thorne well had been completed as a dry hole he told Recknagel to tell Adair to pick up the casing in question and carry it to Adair's "storage yard or trucking yard." Davis testified that Ace paid Adair $120.75 for hauling the casing in question on a bill or invoice which among other things recited: "Dec. 24, 1952, furnish labor and equipmen to move 115 joints, * * * etc. casing *from Emma Thorne No. 1 to pumper's house.*" Davis later testified that he did not know where Adair's "yard" was located but assumed he had one in El Dorado or Smackover. Davis further testified that in the latter part of 1953 "I asked Mr. Adair to bring the pipe over, and Mr. Adair

went to get the pipe, and there wasn't any. I supposed it was in his yard. I didn't know where it was at. *I paid for it to be moved.* I didn't pay any attention to the invoices. The bookkeeper pays those when they come in." Davis further testified that he "did not have the least idea" as to where the *pumper's house* in question was located. We quote further from the testimony of Mr. Davis as follows:

"Q. Now, Mr. Davis, as far as the hauling and storing of this pipe was concerned, is the only thing that you had to do with it what you have related here about telling Mr. Recknagel to get Mr. Adair to take it and put it in his yard? A. That's correct.

"Q. And that was all that was said with reference to the pipe and what was to be done with it? A. And I got the bill. I told him to take the pipe and take it to the yard, and he sent me a bill for it, and I paid the bill, and that's all I had to do with it.

"Q. And that's all you had to do with it, and that's all you know about it? A. That's all. Just on the invoice is all I can stand on.

"Q. And that's all the instructions you gave? A. I gave instructions to Mr. Recknagel and he got Bob to haul it over there, because Leo was in Shreveport and Bob was in El Dorado, and I was talking to Leo quite often.

"Q. But that's the only instructions you gave with reference to the pipe? A. That's right. To carry it into the yard."

We quote from the testimony of appellant Adair as follows:

"A. I directed that the pipe be moved from the Emma Thorne No. 1 well to an area in front of the pumper's house, which was not on the Emma Thorne lease.

"Q. Now, with reference to the storage of the pipe at the Thorne lease, was there any indecision to begin with as to whether it should be

stored at the Thorne lease or in your yards? A. *To me there was none. Mr. Recknagel advised me to move the pipe from the Emma Thorne No. 1 and store it some seven miles away in front of the pumper's house where it could be watched.*

"Q. You never yourself then considered storing it in your own yard? A. *I never was advised of that.*

"Q. At any later date, were you called upon to produce that pipe and deliver it to some other place? A. Yes.

"Q. Was that request made by Mr. Davis? A. I am not sure. It was either Mr. Recknagel or Mr. Davis, I don't recall which.

"Q. And what happened when you tried to find the pipe? A. I sent a truck driver after it, and he reported back that it was not there.

"Q. Now, what did Mr. Recknagel say for you to do with that pipe? A. As well as I recall, he told me to move the pipe from the Emma Thorne lease and store it in front of the pumper's house, which is located some six or seven miles from the Emma Thorne No. 1 dry hole.

"Q. Now what pumper's house? A. The pumper's house that looked after the production in the Buena Vista Field for the Alcan Oil Company.

"Q. For the Alcan Oil Company. He said take this pipe, or something to this effect, up from the Emma Thorne location up to the pumper who works for Alcan Oil Company in this area, or something to that effect. Is that what he said? A. Yes, he asked if I knew where he lived, and I told him I could find out.

"Q. He said the Alcan Oil Company pumper? A. He said the pumper looking after that production.

"Q. The production for Alcan Oil Company? A. That's right.

"Q. I see. Now then, as far as actually taking the pipe yourself, I believe you have already stated that you didn't go out there on the truck and help move it, and didn't have anything actually to do with the transporting of it. A. That's correct.

"Q. Just what did Mr. Recknagel say? Did Mr. Recknagel say to send somebody to get the pipe at the Emma Thorne location, take it to the Alcan pumper's yard, and there store it? Is that all he told you about what to do with the pipe? A. I don't remember all of the conversation. We talk every day. I don't remember the entire conversation.

"Q. Well, is that all you remember about the conversation? A. That's all I remember.

"Q. *As a matter of fact, when you got this pipe, sent out there and got it, took it up to the pumper's, Alcan Oil Company pumper's house and it was unloaded there, you were through with it, weren't you? A. I thought I was.*

"Q. I see. When you submitted a bill to Ace Oil Company for hauling this pipe from the Emma Thorne location up to this Alcan Oil Co. pumper's house, you only billed him for the furnishing of labor and equipment, and the time it took to move it, is that right, Mr. Adair? A. Yes, sir, the labor, time, and equipment.

"Q. That is all you charged him? A. Yes, sir.

"Q. You never have charged him anything more? A. No.

"Q. You don't expect Ace Oil Co. to pay you anything more in connection with that pipe do you? A. No, I do not.

"Q. *You don't have to have any personal knowledge of who this pipe belonged to, do you Mr. Adair? So far as your personal knowledge you don't know who the pipe belongs to?* A. No, sir.

"Q. You didn't make any arrangements with the Alcan Oil Co. pumper to watch this pipe? You didn't hire him to do it, did you? A. Not personally, no.

"Q. Did you, yourself, do anything about that? A. I advised my truck driver to have him watch it.

"Q. I am asking, did you yourself do anything about hiring him to watch it? A. No.

"Q. You don't know what your truck driver told the man, do you? A. No, I wasn't there." (Emphasis added.)

Plaintiff further testified that he never went to the defendant personally and asked him for the pipe and that he had never talked to him on the telephone or had written him a letter or in any manner personally communicated with the defendant about the pipe.

The evidence also reflected that the pipe was stored on temporary pipe racks on an Alcan lease, which employed the pumper, which owned the house and the yard where the pipe was stored.

Mr. Recknagel testified that he called plaintiff and told him to pick up the casing at the Alcan's Emma Thorne No. 1 location and to take it to the yard at Smackover, Arkansas; that plaintiff advised him that he did not have any room for the pipe at Smackover, and the witness then left to plaintiff the finding of a place to store the pipe; that he did not know where this pumper, with whom the pipe was stored, lived; but that it was possibly six or seven miles from the well. On cross-examination, Recknagel testified that he believed he first mentioned to plaintiff that he would like for plaintiff to take the pipe to the yard of Smackover Drilling Company; that plaintiff advised him that there wasn't room in the yard for the pipe and that the witness then left it to plaintiff's judgment to find a location in the immediate area; that they might have discussed leaving the pipe at the house of the pumper, who was employed by Alcan; that it didn't make any difference to the witness where it was left, and they might have agreed on the pumper's house, but he did not recall. That he was acting at the request of C. D. Davis, the Executive Vice-President of Ace, when he talked with plaintiff; that he had never been to the pumper's house and didn't know its location, and was not personally acquainted with the pumper.

Mr. Davis never had any direct negotiations with Adair with reference to Adair's moving the pipe in question to the pumper's house. Also neither Mr. Adair's truck driver nor the Alcan pumper ever testified in the case.

■ The foundation of a bailment lies in contract. The agreement of the parties may be expressed, implied or quasi and constructive, and is governed by the rules which apply to other contracts. 5 Tex.Jur., p. 1016.

■ A bailment has been defined as a delivery of personal property to another for some specific purpose, upon a contract, express or implied, that such purpose shall be carried out. Wilson v. Shear Co., Tex. Civ.App., 3 S.W.2d 849, reversed on other grounds in Phillips v. Citizens' Nat. Bank, Tex.Com.App., 15 S.W.2d 550; 5 Tex.Jur., 1011, 1017; Miller v. Peck, Tex.Civ.App., 258 S.W. 887, err. dism.; Panhandle South Plains Fair Ass'n v. Chappell, Tex.Civ. App., 142 S.W.2d 934.

In City National Bank v. Conley, Tex. Civ.App., 228 S.W. 972, a bailment was defined as a delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust should be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished or kept until the bailor has reclaimed it.

In Panhandle South Plains Fair Ass'n v. Chappell, supra [142 S.W.2d 935], it is stated:

"According to the above authorities and many others, in order to effect a bailment

it is essential that a delivery of the property or article involved in the bailment be made to the bailee by the bailor, except in constructive bailments which arise under circumstances not involved here. Likewise, an essential element of bailment is the acceptance by the bailee of the article bailed under an agreement to restore it to the bailor when the purposes of the bailment have been discharged. During the existence of the bailment, the bailee is clothed with evidence of ownership which means possession, and the contract must be such as to place him legally in possession of the property. Miller v. Peck, Tex.Civ. App., 258 S.W. 887." (Emphasis added.)

In Rust v. Shamrock Oil & Gas Corp., Tex.Civ.App., 228 S.W.2d 934, 935, it is stated:

"The rules concerning bailments and the circumstances under which one becomes a bailee have long been established by the courts of this and many other jurisdictions in this country and repeated by eminent text writers. It is universally recognized that to constitute the relationship of bailor and bailee, there must be a contract expressly entered into or one arising by implication, growing out of the delivery of property to the party entrusted with its care. *There must be a delivery of the property to the bailee and an actual acceptance of it by him. An acceptance by the alleged bailee must be shown because the relation is founded upon contract. The duties and liabilities springing from the relationship cannot be thrust upon one without his knowledge or consent. His acceptance of the property and of the responsibilities accompanying the relationship may be proved directly or by circumstances, but the proof must show that the person sought to be charged as bailee knew he was assuming such relationship and responsibilities concerning the property before he can be charged with the duties and responsibilities growing out of it.* Miller v. Peck, Tex.Civ.App., 258 S.W. 887; E. J. Keller Co., Inc., v. Reading Co., 3 Cir., 49 F.2d 33. * * *" (Emphasis added.)

It is essential to a bailment that there be an acceptance of the subject-matter by the bailee. 8 C.J.S., Bailments, § 15, page 249.

There was no testimony in the record to show any mutual contract between plaintiff and Ace whereby plaintiff ever agreed to take exclusive possession of the casing and store and hold it until Ace called upon him for re-delivery. In fact, plaintiff testified that he did not know who the casing belonged to at the time he had it moved to the Alcan pumper's house at the direction of Recknagel. Plaintiff further testified that as far as he was concerned when his trucks took the pipe to the pumper's house and unloaded it there he thought he was through with it and that he never expected Ace to pay him anything other than for hauling the pipe to the pumper's house. He never attempted to charge any "storage" and his bill (introduced in evidence) shows that it was solely for hauling the casing from the Emma Thorne location to the "pumper's house." Also it is clearly apparent from the record that plaintiff Adair only had possession of the casing on one day, December 24, 1952, the day he hauled the casing from the location to the Alcan pumper's house. The alleged conversion of the pipe took place a month or more later, either in late January or early February, 1953, at a time when same had been out of the possession of plaintiff for a month or more.

It is our view that the only bailment contract that plaintiff Adair agreed to was one to move the casing from the Emma Thorne location to the Alcan pumper's house, which was done on December 24, 1952, which bailment was completed insofar as plaintiff Adair was concerned on that date by delivery of the casing to the Alcan pumper's house. It is our further view that since Adair never agreed to store, safekeep or return the property thereafter, that no bailment therefor existed between Adair and Ace on the date of the alleged conversion. We overrule appellant's first point.

Appellant's second, third and fourth points are deemed to be without merit and are respectfully overruled.

We are content to affirm this case on the holding that there was no bailment existing between Adair and Ace *on the date of the alleged conversion.* And we deem it unnecessary to specifically pass on the questions as to whether there was insufficient evidence to raise a question of fact whether defendant converted the casing in question and as to whether there was insufficient evidence to raise an issue of fact with reference to the value of the casing in question.

Since our decision turns on the proposition that there was no bailment between Adair and Ace *on the date of the alleged conversion,* it follows that Adair could not legally maintain the suit in question against Roberts and therefore since Ace was not a party to that lawsuit, whatever rights, if any, Ace has or had against Alcan and/or Roberts were not litigated in the suit in question, and this decision is entered without prejudice to any rights or causes of action, if any, that Ace has or had against Alcan and/or Roberts.

The judgment of the trial court is affirmed.