A. L. MASSEY et al.,
Plaintiffs-Appellants,

v.

GULF OIL CORPORATION,
Defendant-Appellee.

No. 72–3057.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1975.
Rehearing and Rehearing En Banc
Denied March 21, 1975.

Michael R. Eubanks, Lumberton, Miss., William A. McKenzie, A. Joe Fish, G. Lee Hart, Dallas, Tex., for plaintiffs-appellants.

C. Denton Gibbes, Jr., Laurel, Miss., James A. Boone, Gulf Oil Corp., Jackson, Miss., William G. Duck, Gulf Oil Corp., New Orleans, La., for defendant-appellee.

Before THORNBERRY, GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

This appeal follows a new trial granted by the District Judge. We review the correctness of the order granting that new trial and decide that it was not erroneous.

Plaintiffs own a 1/32 non-participating royalty interest in 122 acres of the Soso Oil Field in Mississippi. They and the other owners of royalty and operating interests in the Soso Field entered into a unitization agreement. This is an agreement under which royalty owners and operators of tracts in a field agree to combine or "pool" the tracts for operational purposes into a single unit to be operated in an integrated manner. See 1A Summers, Oil and Gas, § 104. The Soso Field had been in production several years before the unitization agreement was entered into. Contemporaneously all operating parties joined in an agreement designating Gulf as sole operator of the unit.

Plaintiffs sued Gulf for breach of the contractual obligations owed to them under the unitization agreement by Gulf as the designated operator. Stated briefly,

plaintiffs claimed that Gulf "high graded" the unit by extracting only the oil most easily and least expensively available. The case was tried to a jury which found in answer to specific interrogatories that Gulf had failed in several different respects to carry out the obligations placed upon it by the unitization agreement. The jury returned a general verdict for the plaintiffs, assessing their damages at $265,876.

Gulf moved for judgment n. o. v. or for new trial. The trial judge denied the motion for judgment n. o. v. on the ground that there was "substantial factual support from expert witnesses that [the] Unitization Agreement has been breached and violated by the defendant in several material respects." He granted the motion for new trial and directed a new trial on all issues.

■ In the second trial the jury found for the defendant Gulf. On this appeal plaintiffs do not challenge any part of the second trial but only the propriety of the order granting that trial. Review of the order properly awaited the entry of a final judgment following the new trial. 6A Moore's Federal Practice ¶ 59.15[1], at 59–273ff; 11 Federal Practice and Procedure (Wright & Miller Ed.) § 2818 at 115–116.

The District Judge set out in a written order his reasons for granting a new trial. Though stated in various ways, the heart of his order is that he considered that the evidence of plaintiffs' damages, as calculated by plaintiffs' expert witness and summarized in a single exhibit, lacked credibility. This conclusion was not directed at credibility in the sense of truth versus untruth but in the sense of the lack of accuracy of a complex mathematical computation; that is, the calculation of plaintiffs' damages, as made and summarized by plaintiffs' expert

witness, was not supported by underlying evidence, with the result that the ultimate damage figure could not be accepted as accurate ("credible").[1] An additional fact noted by the judge was that the damages figure assessed by the jury was precisely one-half of the expert's ultimate (and insufficiently accurate) figure, which figure reached by the jury was otherwise unrelated to the evidence.

■ In this circuit the ruling of a trial judge in either granting or denying a motion for a new trial is reviewable under an abuse of discretion standard.[2] United States for use of Weyerhaeuser Co. v. Bucon Construction Co., 430 F.2d 420 (CA5, 1970); Telfair v. Zim Israel Navigation Co., 428 F.2d 127 (CA5, 1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 568, 27 L.Ed.2d 622 (1971); Willitt v. Purvis, 276 F.2d 129 (CA5, 1960); Marsh v. Illinois Central R. Co., 175 F.2d 498 (CA5, 1949). Although the trial judge's discretion is broad with respect to the granting of a new trial, the granting of a new trial constitutes reversible error under certain circumstances. See 6A Moore's Federal Practice ¶ 59.08[5], at 59–162–63.

■ Our review of an order granting a motion for new trial is somewhat broader than review of an order denying a motion for new trial. In Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033 (CA5, 1970), drawing at length from Taylor v. Washington Terminal Co., 133 U.S.App.D.C. 110, 409 F.2d 145 cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969), we pointed out that the operative factors underlying review of a ruling on a new trial motion are deference to the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, deference to the jury's de-

---

1. Of course, credibility is usually for the jury and not the court, as is acceptance or rejection of uncontradicted expert testimony. We pretermit consideration of whether a trial judge can validly set aside a verdict and grant a new trial on the single ground that he does not accept as truthful a witness that the jury was entitled to believe, or rejects uncontradicted expert testimony that the jury was free to accept.

2. The terminology is unfortunate. The phrase abuse of discretion has no pejorative content. It means to us no more than that the court has clearly erred. 6A Moore's Federal Practice ¶ 59.08[6], at p. 59–175.

termination of weight of the evidence and quantum of damages, and the constitutional allocation to juries of questions of fact. We noted that where the judge denies the *motion* and leaves undisturbed the jury's determination, all factors press in the direction of leaving the trial judge's ruling undisturbed. But where the judge has granted a new trial, the factors oppose each other. Deference to the trial judge is subjected to opposing tensions of deference to the jury as the body to whom fact finding is constitutionally allocated and deference to the decision which the jury has reached pursuant to that authority. Furthermore, where a new trial is granted on the ground that the verdict is against the weight of the evidence, we exercise closer scrutiny than where the ground is that some undesirable or pernicious influence has intruded into the trial, because to an extent the judge has substituted his judgment of the facts and credibility of witnesses for that of the jury. Thereby we protect the litigants' right to jury trial. O'Neil v. W. R. Grace & Company, 410 F.2d 908 (CA5, 1969).[3]

Thus we direct our close scrutiny to the predicate for the granting of a new trial, which in its ultimate thrust was the lack of accuracy of the expert's calculation as a basis upon which damages could be assessed. Plaintiffs' primary method for calculating damages was based upon data obtained from records which Gulf was required to and did maintain with respect to the unit. Under the unitization agreement it was necessary to establish a "percentage of participation" ("POP") for each tract in the unit on the basis of which the production from the unit was allocated to the respective tracts. The amount allocated to a tract would be, of course, distributed among the several parties interested in the tract (both operating parties and royalty owners) on the basis of their respective interests. Thus the POP was the critical factor for determining the return which each royalty owner received from the interest which he had put into the operating unit by joining in the unitization agreement.

An initial POP was calculated for each tract in Zone A of the unit (strata down to 12,000 feet) as of the date of execution of the unitization agreement in 1956. The POP of each tract was the proportion that the "evaluated acre feet" of sand under the tract bore to the aggregate "evaluated acre feet" of sand under all tracts. The agreement specifically recognized that operations would provide additional information which might require altering the initial POP's and provided for subsequent revisions of POP's which should take into consideration data obtained from drilling wells and all other available information regarding the extent of the sands. Gulf was obligated to recalculate POP's at six months' intervals over a period of 30 months. The last such recalculation, which would fall in mid-1969, was to be the final recalculation and, with exceptions not here relevant, it would govern for Zone A for the remainder of the life of the unitization agreement.

The arrangements with respect to Zone B (strata below 12,000 feet) were substantially the same, except that the initial POP's were to be established if and when exploration in Zone B resulted in production of oil in commercial quantities. Periodic recalculations of POP's were required, with the final recalculation, falling in 1968, to govern thereafter for Zone B.

■ Plaintiffs introduced evidence of their damages calculated by an expert

---

3. To be distinguished are cases which have determined the propriety of a trial court's award of remittitur. This court has held that a trial judge's remittitur order will be reversed "only where the quantum of damages found by the jury was *clearly* within 'the maximum limit of a reasonable range.'" Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033, 1046 (CA5, 1970), quoting Taylor v. Washington Terminal Co., 409 F.2d 145 (CADC), cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). We do not decide whether this "maximum recovery rule" applies to an order for a new trial. *See* United States v. 1160.96 Acres of Land, 432 F.2d 910 (CA5, 1970).

witness, Thomas M. Rogers, a petroleum engineer and lawyer and former employee of the law department of a large oil company. Rogers employed Gulf's data, utilized by it in making the final recalculation of the POP's for each tract, in 1959 for Zone A and in 1968 for Zone B. Pursuant to Mississippi regulatory procedures, the final POP's, when recalculated, were filed of record in each Mississippi county affected, and at the same time Gulf made public the data supporting the final recalculations, consisting for each zone of a large book of data. These books were introduced in evidence. They showed with respect to each tract the acre feet of pay sand. They showed that in making the final recalculations of POP's, Gulf had applied to this figure various factors such as the porosity of the sand, gas in solution in the oil, *a percentage of recovery factor,* and prices for oil and gas, these calculations eventuating in a dollar value per acre foot of pay sands in the tract. For each tract Rogers multiplied acre feet of pay sand by value per acre foot—both figures having come from Gulf's POP data—producing a dollar valuation of the pay sand in the tract. Then he cumulated the valuations for the tracts in the unit, producing what he identified as the total valuation of recoverable oil and gas in the entire unit. He calculated 1/32 of this amount, producing a value of $953,000. From this he deducted the amount plaintiffs previously had received and a projection of the amount they would receive in the future (based upon Gulf's records showing oil reserves left in the ground). The final figure thus produced was $531,752, described as the value of plaintiffs' share of recoverable oil and gas, less amounts previously paid to the plaintiffs and amounts that would be paid to them in the future.[4] Rogers' compilations of Gulf's figures and his calculations based thereon were reduced to written tabular form and introduced as an exhibit.

Gulf made no objection to introduction of Rogers' calculations and did not cross-examine him. No contention was made then or is made now that Rogers erroneously compiled Gulf's figures or erred mechanically in his calculations based thereon. On appeal, though seeking support from the broad range of discretion accorded trial judges in ruling on motions for new trial, Gulf's position with respect to this primary method of calculation is, necessarily, very narrow. It is that Rogers' calculations were so lacking in probative value that the court, in the exercise of its discretion, could set aside the jury's verdict, which was in an amount less than the amount calculated by Rogers. In support of this contention Gulf argues that the "percentage of recovery factor" of 40% of the oil in the ground, which figure was utilized by it in calculating the POP's, was not proved by plaintiffs to be the percentage of recovery that should have been attained in the unit by proper operations. It is clear that the 40% figure carried forward into Rogers' final figures, because it is embraced in the calculation of the value of oil that should have been produced, from which he deducted the amount actually recovered, the difference being, according to his method, the overall shortfall, of which plaintiffs were entitled to 1/32. Gulf urges that the purpose of calculating POP's is to establish relative shares in production, and that a wholly arbitrary recovery factor can be used in the calculation process, producing computed values that are not factually accurate but nevertheless establish the correct rel-

4. This method was consistent with the court's charge to the jury on the measure of damages:

> [I]f you find from a preponderance of the evidence in this case that the defendant has breached the unitization agreement in some material respect, and you further find that as a proximate result thereof the plaintiffs have been damaged you shall use as a measure of damages, if any, to be awarded the plaintiffs the difference, if any, between the total amount of royalty plaintiffs would have received under the unitization agreement if properly performed and the amount they have received and will receive in the future under said agreement as performed. . . .

ative position of each participant in the production from the unit. The only substantial testimony concerning the recovery factor was that of Gulf's reservoir engineer for the field. He explained that the recovery factor was very difficult to estimate, varying in every oil field all over the world, that it could be as low as zero and sometimes as high as 70%, and that in early stages it was "pretty much of a guesstomate." He explained, that it is common practice to assume 20% recovery, which is about average, that Gulf had studies which said water flooding would be productive in this field, in which case the practice was to assume an additional 20% recovery. The total of 40% was assigned to every reservoir in the Soso field, although "nobody knew what we were going to get." The witness went on to say:

It wouldn't have made any difference if they had used 1 or 10 or 40 or a hundred. Nobody's share of the total would have changed. They would all have been the same.

Q  Is that because you were using a common factor throughout?

A  Yes sir, we were using a common factor throughout, and when you do that the participation would not have changed any, regardless if you used one or forty or a hundred, it would have still been the same, no change.

Q  All right.

A  The engineers knew this, they knew they wouldn't know how much oil they were going to get out of the ground, but it was a good reasonable estimate, they applied it to every reservoir with the full knowledge that it had nothing to do with the value of what we were going to get out of the ground. It was fair because it was applied to every reservoir and to every party, so to calculate your part, it was fair, but it was no way intended, and should never be intended to even resemble the actual value which you were going to get out of the reservoir.

Q  As a matter of fact, Mr. Sinclair, do you know from your study of these reserve figures about actual percentages of recovery, that is, the recovery factors in the reservoir?

A  Yes sir, in the process of making my estimates of the ultimate oil, and by subtracting of course the cumulative from it to get reserve, it's necessary to come up with a recovery factor, and after looking at all of the data and all of these years of performance history which unfortunately, the people, at the time of putting this unit together didn't have, these recovery factors in Soso field in various oil pools are ranging from .3% to as much as 75% of the original oil in place.

What comes through from this testimony is that, while the 40% figure is not purely hypothetical, it was never intended to represent the percentage of recovery that should be obtained by a prudent operator in this field, performing his duties under the contract. But that is the purpose for which Rogers used it.

The plaintiffs suggest alternative approaches to assessment of damages that might support the verdict. There was testimony that an operator usually would have the objective of withdrawing all recoverable oil over a 20-year period at an approximate level rate of withdrawal. Plaintiffs suggest taking the highest royalty received by them in any one year period and projecting it over the years in suit, and deducting from this total the amount they actually received. But this proceeds on the unproven assumption that the highest royalty year is the same as the annual royalty calculated on the basis of an approximate level withdrawal over 20 years. Additionally, this method, applied to the six years in suit, plus interest at 6%, does not produce damages of as much as the jury verdict.

Shortly before trial Gulf wrote down its reserves for the unit by 21,000,000 barrels. Plaintiffs suggest that this represents the amount of oil actually recoverable but not recovered by Gulf because of its breaches of contract, and attempts to compute damages therefrom. But the evidence does not support an inference

**98**

that the write-down was related to Gulf's failures.

Having examined all possible ways of computing plaintiffs' damages within the liberal rules of this court that damages need not be proved with absolute accuracy, we are not able to say that the District Judge abused his discretion in holding that a new trial was warranted because the amount of damages awarded by the jury was not supported by evidence of sufficient accuracy and reliability. Since the order granting the new trial was not erroneous, the judgment for Gulf following the second trial must be, and is, affirmed.