**VALLEY VIEW CATTLE COMPANY, Plaintiff-Appellee,**

v.

**IOWA BEEF PROCESSORS, INC., Defendant-Appellant.**

No. 75–4245.

United States Court of Appeals, Fifth Circuit.

March 18, 1977.

Rehearing and Rehearing En Banc Denied April 15, 1977.

---

Before BROWN, Chief Judge, GOD-BOLD, Circuit Judge, and MEHRTENS*, District Judge.

GODBOLD, Circuit Judge:

Valley View Cattle Company conducted negotiations in Hereford, Texas, with Louie Heller for the sale of 259 head of cattle. Heller took possession of the cattle on January 29 and immediately made arrangements to have them shipped to the Iowa Beef Processors' plant in Emporia, Kansas, where they arrived the next day. On January 30, after receiving the cattle, IBP advanced approximately 90% of the estimated dressed price to Heller.[1] On January 31, after the cattle had been slaughtered, IBP sent Heller a check for the balance due him. Valley View billed Heller for the purchase price but his checks were not honored. On February 12 some of Heller's creditors filed an involuntary bankruptcy petition against him, and later he was adjudicated bankrupt.

Valley View filed this diversity suit against IBP in the Northern District of Texas seeking to recover the value of the 259 head of cattle. Valley View advanced three theories of recovery which were submitted to the jury on special interrogatories: (1) Heller was acting as the agent of IBP in the purchase of the cattle; (2) Heller was vested with apparent authority; and (3) IBP was guilty of conversion because it purchased the cattle from Heller in bad faith and therefore could not receive good title. All issues were resolved in favor of Valley View, and the trial court entered a $113,649.41 judgment for Valley View. IBP moved for a judgment n. o. v. on the ground that there was insufficient evidence to support any theory of recovery advanced by Valley View and in the alternative for a new trial. The motions were denied and IBP appeals. We affirm on the grounds that the trial court did not abuse its discretion in denying IBP's motion for new trial[2]

Edward W. Rothe, Chicago, Ill., Wentworth T. Durant, Charles M. Meadows, Jr., Dallas, Tex., for defendant-appellant.

Mike McKool, Jr., Don Campbell, Dallas, Tex., for plaintiff-appellee.

---

* Senior District Judge for the Southern District of Florida, sitting by designation.

1. Dressed price is based upon the carcass weight of the cattle after slaughter.

2. In this circuit, the grant or denial of a motion for a new trial is within the sound discretion of the trial court and will not be disturbed absent a clear showing of abuse of discretion. *E.g., Harris v. Chanclor,* 537 F.2d 203, 207 (CA 5, 1976); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 851–52 (CA 5, 1975); *Dreiling v. General Elec. Co.,* 511 F.2d 768, 776 (CA 5, 1975); *Woods Expl. & Prod. Co., Inc. v. Aluminum Co. of Am.,* 509 F.2d 784, 792 n. 3 (CA 5, 1975); *Massey v. Gulf Oil Corp.,* 508 F.2d 92, 94–95 (CA 5, 1975); *see also, Urti v. Transport Commercial Corp.,* 479 F.2d 766, 769 (CA 5, 1973).

In *Massey* we stated:

"[T]he operative factors underlying review of a ruling on a new trial motion are deference

and that there was sufficient evidence in support of the jury's finding that Heller purchased the cattle in question as the agent of IBP.[3]

### Agency, Actual and Implied.

■ Under Texas law,[4] "[t]he relation of agency is a consensual relation existing between two persons, by virtue of which one of them is to act for and in behalf of the other and subject to his control." *Sorenson v. Shupe Bros. Co.,* 517 S.W.2d 861, 864 (Tex.Civ.App., 1974), *quoting, Roper v. Compania De Perforaciones Y Servicio, S.A.,* 315 S.W.2d 30, 33 (Tex.Civ.App., 1958) *and Bertrand v. Mutual Motor Co.,* 38 S.W.2d 417, 418 (Tex.Civ.App., 1931). The relationship of agent and principal is created either by express or implied contract or by operation of law. *Green v. Hannon,* 369 S.W.2d 853, 856 (Tex.Civ.App., 1963). Thus, the existence of an agency relationship may be implied from the conduct of the parties. *Panhandle Steel Erectors, Inc. v. Whitlow,* 359 S.W.2d 146, 149 (Tex.Civ.App., 1962).

The Texas courts have adopted Restatement (Second) of Agency § 14K (1957):

### Agent or Supplier

One who contracts to acquire property from a third person and convey it to another is the agent of the other *only if it is agreed that he is to act primarily for the benefit of the other and not for himself.* (Emphasis added.)

See, *American Employers Insurance Co. v. Kilgore,* 412 S.W.2d 67, 69 (Tex.Civ.App., 1967). More particularly, the court in *Kilgore* quoted from and applied the factors for determining the existence of agency set out in the comments to § 14K, as follows:

Factors indicating that the one who is to acquire the property and transfer it to the other is selling to, and not acting as agent for, the other are: (1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property.

Restatement (Second) of Agency § 14K, Comment, at 75–76 (1957); *Kilgore,* 412 S.W.2d at 69.

■ Heller's dealings with IBP commenced in either 1966 or 1967, at which

---

to the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, deference to the jury's determination of weight of the evidence and quantum of damages, and the constitutional allocation to juries of questions of fact. . . . [W]here the judge denies the motion and leaves undisturbed the jury's determination, all factors press in the direction of leaving the trial judge's ruling undisturbed. . . ."
508 F.2d at 94–95.

3. The standard of review for the grant or denial of a motion for judgment n. o. v. was set out in *Boeing Co. v. Shipman,* 411 F.2d 365 (CA 5, 1969) (*en banc*):

"On motion for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence— not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the

Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."
*Id.* at 374–75.

4. The parties agree that Texas law controls.

time Heller contacted IBP's head cattle buyer, Russell Walker, offering to sell IBP two loads of cattle. IBP accepted Heller's offer, and shortly thereafter they entered into a business arrangement or fixed course of dealings which continued for about eight years until the events from which this case arose. Heller would call Walker almost every day and receive the price IBP would pay for dressed cattle, how many head IBP was interested in, when IBP wanted them delivered and how long the offer was open. Heller knew the maximum weight per head that IBP desired. Heller would generally accept all or a portion of the offer either at that time or at a later time before the offer lapsed. Next, Heller would ship the agreed head of cattle to IBP where they would be slaughtered. Once their dressed weight was determined, payment was made to Heller by check. If requested, IBP would advance Heller a substantial portion of the estimated dressed weight of the cattle after they were in IBP's possession. This arrangement was in effect on January 29, 1974, and continued in effect until Heller's bankruptcy.

The parties agree that in the industry there are basically three types of cattle buyers who act as intermediaries between the feed lots and the beef packers:

"Packer buyer": a salaried employee of the packer.

"Order buyer": a person who buys for various packing firms and is compensated on a commission basis. He may buy in his own name, the name of the packer or both.

"Dealer": an independent buyer, who buys for his own account in the hope that he can later resell for a profit. A cattle buyer can function in different capacities in different transactions.

On this appeal IBP argues that there was insufficient evidence from which a consensual agency arrangement between it and Heller can be inferred and that, to the contrary, the evidence demonstrates conclusively that Heller was an independent deal-er buying for his own account and dealt with Valley View in that capacity. Valley View points to evidence which circumstantially tends to show that Heller was not an independent dealer but was an order buyer acting as the agent of IBP and vested with actual or implied authority.[5] Therefore, we review the evidence tending to show the existence of agency, express or implied, bearing in mind the "primarily for the benefit" test of § 14K, the indicia of the comment to that section that were followed and applied in *Kilgore*, the dichotomy in the industry between order buyers and independent dealers, and the details of the arrangements and dealings between IBP and Heller.

(1) Heller was IBP's only regular buyer in the South Plains area of west Texas. IBP had at least some control over the choice of area in which Heller could buy cattle to be shipped to IBP.

(2) It was understood between Heller and IBP what kind of cattle IBP was interested in. Heller called IBP almost every day to find what IBP would pay for dressed cattle and how many head IBP wanted. Thus, IBP controlled size, quality and quantity purchased by Heller to be shipped to it.

(3) Although no evidence of the exact volume of Heller's dealings with IBP was introduced at the trial of the case, it is apparent that these dealings constituted a large percentage of Heller's total business. Robert Wagoner, a truck driver who hauled approximately 100,000 head of cattle per year for Heller, testified that 98% of the cattle he handled were delivered to rail cars bound for IBP's plant in Emporia, Kansas. A feed lot manager stated that 85 to 90% of the cattle Heller bought at his feed lot were shipped to IBP. Heller testified that IBP would generally take whatever he could get. According to the testimony of Eugene Redd, a livestock order buyer and independent dealer, Heller was the only purported dealer Redd had ever encountered doing such a large volume of business with one packer.

5. Heller was not a salaried employee of IBP and, therefore, was not a packer buyer.

(4) IBP regularly advanced to Heller, at his request, a large portion of the estimated dressed price of the cattle, and in the instant transaction advanced 90%. In the early stages of their dealings Heller did not ask for advances, but as time passed his requests became more and more frequent. Heller could not recall a request for an advance being denied or altered in any way. Redd testified that advancing in this manner was an uncommon practice, not generally available to a dealer. Another witness testified that risk of loss was a distinguishing feature between dealers and order buyers. Inferentially, Heller's regular receipt of advance notice from IBP of the price he would be paid limited his risk of loss and was inconsistent with the status of an independent dealer.

(5) Dealers normally pay cattle sellers within 48 hours after the cattle are weighed. Heller customarily paid his sellers by check written on the weekend for purchases made during the week.

(6) Heller consistently paid "top dollar" among cattle buyers in the South Plains and helped to hold the market price up. Inferentially, an independent dealer buying for his own account could not regularly do this and survive.

(7) Heller leased railroad cars for the sole purpose of shipping cattle to IBP's Emporia, Kansas, plant. Plaintiff's expert witness, Holly Toler, stated this practice was consistent with his conception of an order buyer.

(8) IBP's daily conversations with its packer buyers were similar to its instructions to Heller.

(9) Heller billed IBP with invoices on which, below his name, was printed "LIVE-STOCK DEALER" and "ORDER BUYER."

(10) During a price freeze in 1973, IBP was unable to sell to its customers and make a suitable margin. At IBP's instruction or request Heller made an unusually large purchase of cattle and shipped them directly to IBP customers in his name.

(11) Though not in connection with the instant transaction, Heller had told Cox (owner of Valley View) and Moss (operator of the feed lot where the cattle were picked up and invoiced out) that he bought cattle for IBP.

There is, on the other hand, considerable evidence which tends to prove that Heller dealt with Valley View as an independent dealer.

(a) The cattle bought by Heller from Valley View on this and prior occasions were invoiced to him, the feed lot's scale tickets showing weight of the animals named him as buyer, and he paid with his own checks.

(b) At times Valley View had sold cattle to IBP's salaried packer-buyers, and these had been paid for by IBP checks.

(c) On Valley View's books the transaction was shown in Heller's name.

(d) The cattle were shipped by rail, and the bill of lading showed Heller as shipper. No documents sent with the cattle showed IBP where they had been bought.

(e) On February 20, Valley View made a book entry charging off Heller's bad checks as "Bad debt—James Heller."

(f) Valley View claimed against Heller's Packers & Stockyards Act surety bond, asserting that he was the purchaser of the cattle, and against Heller's bankrupt estate, and partially recovered from both.

IBP asserts that ample evidence was introduced tending to satisfy the agency-negating indicia of the Restatement and *Kilgore*. Heller always received a fixed price from IBP. This, according to the Restatement, is the most important factor. No factor, however, is conclusive. For example, the Comment to § 14K states that if there is agency the difference between what the agent paid for goods and what he is to receive for the goods must "normally . . . be accounted for," but that a "principal may agree that his buying agent is to retain the amount."

Heller received title to the cattle in his own name, but he told Moss and Cox that he bought cattle for IBP on the South Plains.

**1224**

As to the third indicium under § 14K, it is not disputed that with respect to other packers Heller operated as an independent dealer engaged in buying cattle for his own account and selling to packers. But the volume was relatively small in comparison to the large volume done with IBP, and there is no contention that these purchases and sales were done in the same or similar manner to the arrangement carried on with IBP and described above.

The body of evidence gravitates in two different directions. It tends to establish that, with respect to his purchases of cattle destined for IBP, Heller gave the appearance of an independent dealer and Valley View dealt with him as though he were an independent dealer. But this evidence does not obviate the possibility that, by arrangement express or implied between IBP and Heller, Heller was actually authorized to serve as IBP's agent in buying cattle. The special arrangements between them, and the other evidence, some of which we have outlined, permitted a jury to draw that inference.

Much of the evidence relied upon by IBP tends to negate that Heller was clothed with apparent authority and to establish that Valley View dealt with Heller as an independent dealer (and therefore did not rely upon apparent authority). Most of it does not reach the question of whether Heller was acting with actual or implied authority, that is, was actual agent for IBP. The most persuasive evidence to us is the combination of advances by IBP and delayed payments by Heller (Heller often paid later than the period prescribed by the Packers & Stockyards Act), so that in effect cattle bought by Heller were being paid for by IBP's funds channeled through Heller's bank account. The arrangement permitted Heller to buy in greater quantities than a dealer operating in the usual manner would have been able to buy. Advances to Heller averaged around $7,000,000 for a month or slightly more than a month. There was evidence that the packing industry as a whole does not engage in the practice of making advances. Also the arrangement between IBP and Heller gave IBP considerable actual control over Heller's activities and even broader power of control.

As jurors we might have reached a different verdict. But we do not sit as thirteenth jurors. The evidence was sufficient to take the case to the jury on actual and implied authority, the jury has decided that, and there it must end. We need not discuss the other issues.

AFFIRMED.