**LUBBOCK FEED LOTS, INC., and Lockney Cooperative Gin, Plaintiffs–Appellees,**

v.

**IOWA BEEF PROCESSORS, INC., Defendant–Appellant.**

No. 78-2271.

United States Court of Appeals, Fifth Circuit.

Nov. 10, 1980.

Rehearing and Rehearing En Banc Denied Dec. 18, 1980.

254

Edward W. Rothe, James T. Malysiak, Chicago, Ill., Roy Bass, Lubbock, Tex., Robert L. Templeton, Amarillo, Tex., for defendant–appellant.

Hewett, Johnson, Swanson & Barbee, Mike McKool, Jr., Charles W. Cunningham, Moore & Peterson, Don Campbell, Dallas, Tex., for plaintiffs–appellees.

Before MORGAN, CHARLES CLARK and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant packer appeals from judgment holding it liable to the plaintiffs, feedlot operators, for the unpaid price of cattle purchased by a buyer found to be its agent. The present appeal concerns some of the substantive issues decided adversely to the same defendant by another panel of this circuit in *Valley View Cattle Co. v. Iowa Beef Processors, Inc.*, 548 F.2d 1219 (5th Cir. 1977).

The plaintiffs, two Texas feedlot operators, sold their customers' cattle to one Louie Heller. Heller, in his turn, passed the cattle on to the defendant out–of–state

meat packer in purportedly a sales transaction. The packer paid Heller in full, but Heller's checks to the feedlot operators were dishonored because of his insolvency. Able to recover only a portion of the purchase price from the insolvent Heller, the feedlot operators filed this action in Texas state court to recover the balance from the packer. The case was removed by the packer to the United States District Court for the Northern District of Texas on grounds of diversity of citizenship. It was there tried to a jury. In response to special verdict instructions, the jury found that the relationship between Heller and the meat packer was one of agency and not of dealer–purchaser. On that basis the feedlot operators were awarded some $512,000 plus six percent prejudgment interest. From that judgment the packer appeals, urging numerous bases for reversal. For the reasons set forth below, the judgment of the district court is affirmed.

## Factual Context

The plaintiff–appellees in this action, Lubbock Feed Lots, Inc. (Lubbock) and Lockney Cooperative Gin, Inc. (Lockney), are custom feedlots. Their function in the cattle industry is dual. They serve both a "hotel" and sales function: There, cattle are fed and cared for to fatten them and render them suitable for slaughter; there also prospective buyers visit to inspect the cattle and to negotiate terms of sale with the feedlot operators. When a prospective buyer makes an offer for the cattle, the feedlot operator–depending upon his agreement with the cattle owners—either communicates the offer to the owner and obtains the owner's response or counter–offer, or exercises his authority to accept or reject the offer himself. The sales price is on a "live-weight" basis—the total weight of the animals sold multiplied by the negotiated price per pound. When the terms of the sale are agreed upon, the cattle are weighed; as they cross the scales, delivery is effected and the cattle become the property of the buyer. The feedlots send an invoice along with the cattle, and it is usual that the buyer mails his check in payment

to the feedlots upon receipt of that invoice. The manner in which remittance of the purchase price is made by the feedlots to the cattle owners is not entirely clear from the record—Lockney, it appears, would deduct any unpaid balance due on the owner's feed bill or other charges and then forward the proceeds to the owners.

The defendant–appellant in this action, Iowa Beef Processors, Inc. (IBP), is a large meat packer that purchases cattle for slaughter, processing, and packaging. Its purchases, generally conducted through an intermediary, are on a "dressed–weight" basis—the weight of the dressed carcasses of the purchased cattle multiplied by the agreed upon price per pound. Thus, the packer does not know the exact price he will pay for a given shipment of cattle until he has received delivery and slaughtered, dressed, and weighed the cold carcasses. At that point, the packer is obliged to remit payment to his seller.

Louie Heller, the bankrupt whose insolvency has precipitated this action, was IBP's intermediary in the sales/purchases that are the focus of this case. The cattle industry recognizes three basic categories of cattle buyers who act as intermediaries between the selling feedlots and the purchasing meat packers:

(1) Packer buyers, who are salaried employees of the packer;

(2) Order buyers, who buy for various packers either on a commission basis or for a fixed price from the packers, and who may purchase cattle (a) in their own name, (b) for the packer, or (c) both; and

(3) Dealers, who are independent purchasers buying in their own name in the hope of reselling at a profit, and who bear the risk of market price fluctuations.

Between January 14, 1974, and February 4, 1974, Heller made six purchases from Lubbock and four purchases from Lockney—transactions involving some 1700 head of cattle. All the cattle purchased in these transactions ultimately found their way to IBP. Upon receipt of the cattle from Heller, IBP advanced money to him against the

ultimate price. These advances never exceeded the final price to be paid. Upon dressing and weighing the carcasses, either the same day or the day following delivery, IBP paid over to Heller the difference between the advances and the exact purchase price. It is undisputed that IBP paid Heller in full for all of the purchases in question. Heller's payment to the feedlots, however, was not so promptly made—as a rule, seven to ten days elapsed between Heller's receipt of delivery and the issuance of his checks—and in the interim between IBP's payment to Heller and the feedlots' attempts to cash Heller's checks, Heller became insolvent and his checks were ultimately dishonored.

At the trial below, the jury responded to sixteen special interrogatories to find: (1) that Heller was acting as IBP's agent in the purchases from both Lubbock and Lockney; (2) that Heller represented to Lubbock and Lockney that he was acting for IBP; (3) that IBP conducted its activities so as to lead a reasonably prudent person to believe that Heller was its agent; (4) that Lubbock and Lockney were led to reasonably believe by Heller and IBP that Heller was IBP's agent; (5) that although both Lubbock and Lockney failed to require Heller to pay promptly, that failure was neither negligent nor the proximate cause of the feedlots' losses; and (6) that although both Lubbock and Lockney continued to deliver cattle to Heller when Heller was delinquent in payments for previous cattle purchases, such delivery was neither negligent nor the proximate cause of the feedlots' losses. On the basis of those findings, the district court entered its judgment in favor of Lubbock and Lockney.

From that judgment IBP appeals, urging the following bases for reversal:

(1) That the feedlot operators are not the real parties in interest as is required by the Federal Rules of Civil Procedure, and thus lack standing to sue;

(2) That the trial below was unduly influenced by an earlier decision of this court (*Valley View*, cited *supra*) that misapplied Texas agency law in a case also involving the nature of the relationship between Heller and IBP;

(3) That the district court erroneously admitted hearsay evidence on the issue of Heller's status as agent for IBP;

(4) That without the erroneously admitted evidence there is insufficient evidence to support the jury's findings of agency and apparent agency; and that the feedlot operators failed to exercise due diligence to determine whether Heller was acting on his own behalf, or on behalf of IBP, in purchasing the cattle in question;

(5) That the feedlot operators are equitably estopped from pursuing this remedy against IBP because they extended unusually liberal payment terms to Heller despite their knowledge of his financial difficulties and of IBP's full payment for the cattle;

(6) That by suing Heller the feedlot operators elected their remedy under Texas law and cannot now pursue this inconsistent remedy against IBP; and

(7) That the district court erred in awarding prejudgment interest.

For the reasons delineated below, we reject the arguments of IBP and affirm the judgment of the district court.

## 1. *Real Parties in Interest*

Arguing that the law of Texas affords the feedlots no right of action for the relief sought in this case, IBP challenges their status as real parties in interest within the meaning of Rule 17(a) of the Federal Rules of Civil Procedure.[1]

■ IBP is correct in its assertion that we must look to the governing substantive law—here, the law of Texas—to determine whether the plaintiffs in this action are

---

1. Fed.R.Civ.P. 17(a) provides:

Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought . . . .

indeed the real parties in interest—i. e., the party who, by the substantive law, has the right sought to be enforced—as is required by Rule 17(a). *United States v. 536.71 Acres of Land,* 418 F.2d 551, 556 (5th Cir. 1969); *see Galarza v. United Bus Lines, Inc.,* 38 F.R.D. 401, 404–05 (S.D.Tex.1965); 3A Moore & Lucas, Moore's Federal Practice ¶¶ 17.07, 17.12 (2d ed. 1979); 6 Wright & Miller, Federal Practice & Procedure: Civil §§ 1543, 1544, 1548 (1971); *see also* 2 Barron & Holtzoff, Federal Practice and Procedure § 482 at 7–8 (Wright ed. 1961). Thus, the mere fact that a plaintiff falls within one of the classes of persons enumerated in Rule 17(a) is not dispositive of the real party in interest question, for that rule

assumes that the enumerated persons are granted the right to sue by the applicable substantive law. Wright & Miller, *supra,* § 1543, at 645.

The plaintiff feedlots do not dispute this reading of Rule 17(a), but without conceding it[2] argue that their right to sue as bailees, as agents for partially disclosed principals, and as agents to whom performance was owed, is clear under Texas law.[3]

IBP vigorously challenges these bases for the feedlots' status as real parties in interest in this action. There can be no right to sue as bailees, IBP argues, because the bailment had terminated before the conversion had occurred.[4] As to the agency claims,

---

**2.** The district court appears to have felt that Rule 17(a) was dispositive on its face.

**3.** (1) *As bailees.* The plaintiff feedlots argue that Heller's default after taking delivery of the cattle constituted a conversion, entitling them, as the bailees of the converted cattle, to sue for their value. *See Christian v. First National Bank of Weatherford,* 531 S.W.2d 832, 841 (Tex.Civ.App.1975) (party with actual possession or the right to immediate possession, as well as party with title, may sue for conversion); *Kroll v. Collins,* 340 S.W.2d 838, 840 (Tex.Civ.App.1960) (in cash sale, buyer's default after taking delivery constitutes conversion).

(2) *As agents for partially disclosed principal.* The feedlots argue that, since Heller knew of the existence of the feedlots' agency but did not know the identity of the principals, the feedlots were acting as agents for partially disclosed principals and were therefore party promisors on the sales contract with the right to sue in their own names for its breach. *See* Restatement (Second) of Agency §§ 321 & Comment (a), 364 & Comment (b) (1957); 2 Tex.Jur.2d, Agency § 211, at 666 (1959).

(3) *As agents to whom performance was owed.* Finally, the feedlots argue that, since all parties involved in these transactions agreed that payment should be made to the feedlots rather than to the cattle owners, the feedlots were party promisees to the contracts, and were thus entitled to sue in their own name for its breach. *See* Restatement (Second) of Agency § 364 & Comment (d) & Illustration 4 (1957).

**4.** The parties devote considerable attention and vigor to the question of a bailee's right to sue under these circumstances.

IBP contends that there could be no right of action for conversion in the feedlots because the bailment had terminated before the alleged conversion occurred. The gist of this argument

is that by universal custom in the industry, delivery is effected, and title passes, when the cattle cross the scales. Thus, at that point, any right to possession in the feedlots necessarily ceases. *See* Tex.Bus. & Com.Code Ann. § 2.401(b) (Vernon 1968) (hereinafter cited as Texas UCC) (unless otherwise expressly agreed, title passes with completion of physical delivery). Since title, actual possession, or the right to possession, are prerequisites to the right of action for conversion, the feedlots can have no such right. *Adair v. Roberts,* 276 S.W.2d 565, 570–71 (Tex.Civ.App.1955).

The feedlots respond that the transactions in question here were cash sales by universal custom in the industry. Relying on pre–UCC Texas cases and the Fifth Circuit case of *In Re Samuels & Co.,* 510 F.2d 139 (5th Cir. 1975) (hereinafter *Samuels I* ), *rev'd en banc* 526 F.2d 1238 (5th Cir. 1976) (hereinafter *Samuels II* ), the feedlots contend that title remains with the seller in cash sales until payment is made, and that, therefore, the bailment was still in existence at the time of Heller's default, and the feedlots are entitled to sue for conversion.

In response, IBP vigorously challenges the feedlots' characterization of this court's holding in *Samuels II,* reversing *Samuels I.* According to IBP, *Samuels II* clearly holds that the pre–UCC "cash sales" doctrine relied upon by the feedlots was abrogated by the adoption in Texas of the Uniform Commercial Code.

This exchange between the parties raises questions of fundamental importance in the interpretation and application of the Uniform Commercial Code and this court's *en banc* opinion in *Samuels II.* We are reluctant to address such questions here, in the context of so clearly peripheral an issue as an agent's entitlement to sue on a contract made for his principal. Our resolution of the real party in interest question, in the text below, makes it unnecessary for us to do so.

IBP contends that the feedlots cannot sue as agents for partially disclosed principals or as agents for collection because they are not suing on behalf of their principals (they are, rather, suing to enforce their *own* claims arising from their purported payments to the cattle owners), and because they failed to claim or to prove that their principals have authorized such suits; and that they cannot sue as agents for partially disclosed principals because they did not raise that issue at trial[5] and because they have not proved their principals' identities were, in fact, unknown to Louie Heller at the time the sales agreements were reached.

■ Without reaching the merits of IBP's claim that the plaintiffs were not, as *bailees*, the real parties in interest (*see* note 4 *supra*), we do not find to be persuasive IBP's argument that the plaintiffs, as *agents* of the original owners of the cattle in their sale to IBP, did not possess substantive rights to enforce payment of the purchase price from IBP. They were thus real parties in interest, within the intendment of Rule 17(a).

■ An agent who is a party promisee on a contract made by him on behalf of his principal may bring suit on that contract in his own name.[6] Restatement (Second) of Agency § 364 (1957):

A person with whom an agent makes a contract on behalf of a principal is subject to liability in an action brought thereon by the agent in his own name on behalf of the principal if the agent is a party promisee.

(It is undisputed in the present case that all parties to the sales contracts in question contemplated that the buyer would make payment to the feedlots and to the feedlots alone.) Further, an agent who has an interest in the subject matter of the contract made by him on behalf of his principal may bring suit on that contract in his own name, even if he is not a party promisee. *Id* § 372(1):

Unless otherwise agreed, an agent who has or who acquires an interest in a contract which he makes on behalf of his principal, can, although not a promisee, maintain such action thereon as might a transferee having a similar interest.

As summarized in a Restatement Comment:

The customs of business or the course of conduct between the principal and the agent may indicate that an agent who ordinarily has merely a security interest is a transferee of the principal's rights under the contract and as such is permit-

---

5. Citing the recent Supreme Court decision in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), IBP urges this court not to consider the feedlots' contention that they have standing to sue as agents for partially disclosed principals. IBP argues that the issue was not raised at trial—that is, IBP contends, the *ground* was not argued in the trial court (partly because the trial court had little doubt that, as "bailees," the plaintiffs were real parties in interest under Rule 17(a).) IBP contends that, therefore, it had no fair opportunity to explore the factual basis upon which that claim is grounded.

Our resolution of the real party in interest question does not turn on whether the feedlots' principals were disclosed, partially disclosed, or undisclosed, and it is therefore perhaps unnecessary for us to address this argument. Here, the real party in interest issue was raised and was briefed in the district court, and both parties had every opportunity to present whatever evidence might exist on that question. We are unable to find the *Singleton* rationale apposite here.

6. The comments to Section 364 of the Restatement may help to bring that proposition into focus:

It may be inferred, from business customs, that the other party to a contract has agreed with the agent to pay the purchase price to the agent, and not to the principal in person or to any other agent of the principal. Such customs exist in the case of purchases from factors and auctioneers. In such cases, the agent can properly maintain an action in his own name.

*Id.* § 364 Comment (d).

*See* 25 Tex.Jur.2d, Factors and Commission Merchants § 1, at 209 (1961):

A factor is a person specially employed to receive goods from a principal and sell them for a compensation; he is an agent who pursues the business of selling for a commission goods or merchandise consigned or entrusted to his possession by the owner for the purpose of sale for the owner.

ted to bring suit. If the agent has settled with his principal with the understanding that he is to collect the claim against the obligor by way of reimbursing himself for his advances and commissions, the agent is in the position of an assignee who is the beneficial owner of the chose in action. He has an irrevocable power to sue in his principal's name. And, under the statutes which permit the real party in interest to sue, he can maintain an action in his own name.... Even though the agent has not settled with his principal, he may, by agreement with the principal, have a right to receive payment and out of the proceeds to reimburse himself for advances and commissions before turning the balance over to the principal. In such a case, although there is no formal assignment, the agent is in the position of a transferee of the whole claim for security; he has an irrevocable power to sue in his principal's name and, under statutes which permit the real party in interest to sue, he can maintain an action in his own name.

*Id.* § 372 Comment (a).

These principles apply in the present case. It is undisputed that the agreements between the feedlots and the cattle owners, according to both long business custom and the settled course of conduct between the parties, contemplated the provision of custom feeding services and the handling of all facets of the subsequent sales by the feedlots, in return for which the feedlots were authorized to collect payment and from those proceeds withhold reimbursement for any and all advances and charges arising from that agreement.

A Restatement Comment notes:

Ordinarily, a factor [*see* note 6 *supra*] or auctioneer can maintain an action in his own name against a person to whom he has sold goods, either because of the rule stated in this Section [i.e., he is a party promisee within the meaning of Section 364] or because of that stated in Section 372 [i.e., he has an interest in the contract as described in Section 372]. Frequently the factor or auctioneer is acting for an undisclosed or partially disclosed principal. In such cases, since he is the promisee, his power to bring suit is clear. In other cases, however, the factor or auctioneer is acting for a known principal. In some of these cases, the factor or auctioneer has the beneficial interests because of advances upon the goods, and comes within the rule stated in Section 372. In other cases, however, in which the factor or auctioneer has no personal interest and is acting for a disclosed principal, suit by the agent in his own name has been permitted; only by the inference stated in Comment (d) [*see* note 6 *supra*] does a reason for permitting suit exist.

*Id.* § 364 Comment (e).

The relationships involved in the present case cannot readily be distinguished from those described above, by reason of which an agent has a independent right to sue a third person. Like factors, the feedlots· have the right to sue for the purchase price on these contracts either because they had the beneficial interest by virtue of their advances to their principals, or because they were party promisees as agents to whom performance was due.

Our examination of the Texas jurisprudence uncovers no decision expressly confirming an agent's entitlement to sue for the purchase price in his own name by virtue of his status as a party promisee on the contract. Conversely, however, we find no case rejecting that right. The circumstances in which the courts of Texas expressly recognize an agent's right to sue in his own name—(1) Where he has contracted in his own name, (2) where his principal is undisclosed, (3) where, "by the usages of trade," he is authorized to act as the owner of the property, or (4) where he has an interest in the subject matter of the contract, *see Tinsley v. Dowell*, 87 Tex. 23, 26 S.W. 946, 948 (1894); 3 Tex.Jur.3d, Agency § 157 (1980)—suggest, however, that an agent who is a party promisee may sue in his own name.

■ The right of a factor or commission merchant to sue in his own name for the

purchase price is recognized in Texas, as well as in most American jurisdictions. *E.g.*, Restatement (Second) of Agency § 364, Comment (e); 25 Tex.Jur.2d, Factors and Commissions Merchants § 24, at 234 (1961); Seavey, Handbook of the Law of Agency § 136B. (1964). In Texas, the factor's right to sue in his own name is deemed to fit within the four recognized criteria noted above:

> The exception applicable where the agent is authorized to act as the owner of the property arises frequently by virtue of the custom or usages of the particular trade involved, and particularly in connection with factors and commission merchants. . . .

3 Tex.Jur.3d, Agency § 157 (1980) (footnotes omitted).

> In his dealings with third persons, a factor has a sufficient interest in the property consigned to him to permit him to sue or be sued in his own name.

25 Tex.Jur.2d, Factors and Commission Merchants § 24, at 234 (1961) (footnotes omitted). Professor Seavey and the Restatement merely suggest that such criteria encompass an additional aspect of the relationship, by reason of which the agent or factor may sue in his own name: as a party (promisee) to the contract by virtue of being owed performance. Restatement (Second) of Agency § 364, Comments (d) & (e), Illustration 4, and § 372 Comment (a) (1958); Seavey, *supra*, § 136B.

We conclude that, similarly to factors, under Texas law the present feedlots, as agent–promisees, are entitled to sue in their own names to enforce the contract made on behalf of their principals. Needless to state, we do not intimate that the feedlots are factors or commission merchants within the meaning of, or for the purposes of, the state regulatory scheme governing the conduct of commission merchants,[7] livestock commission merchants,[8] or livestock auction commission merchants.[9] Nevertheless, the relationships and operations involved in the present case are functionally indistinguishable from those to be found in the factorage situation. We can find no basis for distinguishing between the two, at least insofar as we are concerned with determining the sufficiency of the feedlots' interest in the disputed sales for the purpose of ascertaining their right to bring this action to recover the purchase price.[10]

We hold, therefore, that the law of Texas entitles the feedlots to bring this action in their own names, whether or not they have paid over to the cattle owners the full amount of the sales proceeds, and that the feedlots are thus the real parties in interest in this action within the meaning of Rule 17(a) of the Federal Rules of Civil Procedure.

### 2. The Valley View Question

IBP argues with great vigor that this court's recent decision in *Valley View Cattle Co. v. Iowa Beef Processors, Inc.*, 548 F.2d 1219 (5th Cir.), *rehearing en banc denied*, 551 F.2d 865 (5th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126

---

7. Tex.Rev.Civ.Stat.Ann. art. 1274 et seq. (Vernon 1963).

8. *Id.* art. 1281a et seq. (Vernon Supp.1979).

9. *Id.* art. 1287a et seq. (Vernon 1963).

10. The feedlots seemingly fit within the statutory definition of "live stock commission merchant":

> Any person, firm or corporation who pursues the business of selling livestock, cattle, . . . upon consignment for a commission or other charges . . . shall be held to be a live stock commission merchant within the meaning of this chapter.

*Id.* art. 1281a (Vernon Supp.1979). Whether or not in fact the feedlots are within the statutory regulation, our point is not that the feedlots would be held to be factors or commission merchants within the meaning of that statute, but rather that the functional purposes the Texas and American jurisprudences recognize as served by entitling such factors and commission merchants to sue in their own names apply with equal validity to the feedlots in the present case. In this light it is interesting to note that a recent Colorado case, relying in part on Texas authority, held livestock auction commission merchants to be sellers within the meaning of the Uniform Commercial Code. *Ranchers & Farmers Livestock Auction Co. v. Honey*, 38 Colo.App. 69, 552 P.2d 313 (1976).

(1977) "infected" the trial and ultimate result in this case with an interpretation of Texas agency law that is blatantly incorrect. IBP urges this panel to overturn *Valley View* in order to preserve the sanctity of the rule announced in *Erie R. Co. v. Tomkins.*[11]

This we are unable to do. Until contradicted by the courts of Texas or modified by this court sitting *en banc, Valley View* remains this circuit's binding interpretation of Texas law on the precise points it addresses.

### 3. The Sufficiency of the Evidence: Actual Agency

IBP contends that the evidence as shown in the record on appeal is insufficient to support the jury's finding that Louie Heller acted as the agent of IBP in the purchases that lie at the center of this controversy. With regard to the evidentiary rulings (subsection A below), the gist of IBP's position is that the district court erred, first, in admitting evidence that was legally inadmissible, and second, in refusing to give limiting instructions that would have restricted the jury's use of evidence inadmissible to prove actual agency, but admissible for other purposes, to those purposes for which it was admissible. With regard to the sufficiency of the evidence (subsection B below), IBP argues that the remaining evidence, excluding that which was tainted by error, is insufficient to support the jury's finding of actual agency; therefore, IBP urges us to overturn the judgment of the district court. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2885 (1973).

### A. The Evidentiary Rulings

Not disputing the wide and flexible discretion of the district court in the admission or exclusion of evidence, *id.*, IBP nevertheless contends that prejudicial error occurred with regard to the testimony of (1) Randa Shade, (2) Timothy Guss, (3) Eugene Redd, and (4) Henry Winter and Jay Crofoot, without which testimony the evidence is insufficient to support the verdict.

**11.** 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### (1) The testimony of Randa Shade.

Randa Shade occupied the desk next to Heller's in the Amarillo commodities offices in which Heller owned an interest. Shade testified that, as secretary, she took telephone calls for Heller from both the feedlots and IBP. She testified that Russ Walker of IBP called Heller every day, sometimes several times during the course of a day, that she was familiar with and recognized his voice, and that she had on occasion spoken with him herself. She testified that sometimes Heller called Walker. She testified that she could not recall any packers other than IBP calling Heller.

When she was asked to recount what she had heard Heller say during his conversations with Walker, IBP objected to that testimony as hearsay. The trial court overruled IBP's objection, stating that the testimony was admissible to contradict Heller's prior testimony relating the subject matter of those conversations, and instructing the jury to limit its use of that testimony to the purpose of impeachment. R.IX: 986.

Shade then testified that Heller spoke to Walker about the cattle business, frequently asking how many cattle Walker wanted him to buy, whether Heller should give "50 higher or 50 lower," and what sort of cattle Walker wanted. She also testified that when Heller's financial situation began to deteriorate, he sought help from "several people." Over IBP's objection, Shade identified Russ Walker of IBP as one from whom Heller has sought financial assistance.

On this appeal, IBP argues that the testimony of Randa Shade was inadmissible in general as hearsay, and in particular as evidence of the out-of-court declarations of the alleged agent offered to prove the existence of the agency relationship.

Hearsay is defined as

a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Fed.R.Ev. 801(c). An out–of–court utterance must have two characteristics before it is rendered inadmissible as hearsay: It must be a "statement"—that is, a verbal assertion, or conduct intended as an assertion, Fed.R.Ev. 801(a)—and it must be offered to prove the truth of the matter it asserts. *E.g.,* 4 Weinstein & Berger, Weinstein's Evidence ¶ 801(c)[01] (1979). Furthermore, it is clear that the central characteristic of a "statement" or "assertion" is the *assertive intent* of the declarant—conduct, whether verbal or nonverbal, is excluded from the operation of the hearsay rule in the absence of assertive intent. *Id.* Thus, excluded from the hearsay rule is verbal or non–verbal "conduct when it is offered as a basis for inferring something *other* than the matter asserted." *Id.* at 801–63 (Italics supplied). Therefore, verbal *conduct,* as opposed to verbal *assertions,* may be admitted in evidence, in part because it is not assertive and in part because it is not intended to prove the truth of the matter asserted:

> We must avoid, of course, the easy temptation to brush all of this aside as hearsay. We have, on numerous occasions, taken pains to point out when the fact to be proved is a word spoken, it is an uncritical error to protest as to hearsay. The verbal act, as any other act, may be proved by one who heard, saw it, or felt it. [Citations omitted.]
>
> The inquiry is not the *truth* of the words said, merely whether they were said.

*General Tire of Miami Beach, Inc. v. NLRB,* 332 F.2d 58, 60–61 (5th Cir. 1964) (Italics in original).

The district court found this testimony admissible as impeachment evidence contradicting Heller's previous testimony concerning those same conversations, and expressly instructed the jury to limit its consideration to that purpose. Insofar as the hearsay rule is concerned, that ruling is well within the court's discretion. *See* Fed. R.Ev. 105.[12]

Although it is virtually a truism in the courts of Texas that the out–of–court declarations of an alleged agent are not competent proof of the existence of the agency relationship, 3 Tex.Jur.3d, Agency § 240, at 331, also p. 329 n.332 (1980); *see also id* § 240, at 329, § 248 (1980),[13] we need not here determine whether the verbal conduct in question, no less than testimony as to a physical fact from which the jury might infer agency, does not amount to a prohibited out–of–court declaration by the agent, for we have already determined that the testimony is admissible for the purpose to which the district court restricted it—the impeachment by contradiction of Louie Heller's testimony. Fed.R.Ev. 105 (See note 12, *supra).*

For these reasons, we find no error in the district court's admission of the testimony of Randa Shade.

*(2) The deposition of Timothy Guss.*

Timothy Guss was Louis Heller's business partner in the Amarillo commodities office, and occupied a desk in the vicinity of Heller's.

IBP stipulated the identification of Guss and his relationship to Heller, but objected that the deposition was inadmissible since Guss stated at its outset that he knew noth-

**12.** Rule 105 provides:
> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

**13.** We note, however, that the Texas cases invoking this rule almost universally deal with out–of–court statements directly asserting the existence of the agency relationship or otherwise asserting the existence of liability in the alleged principal, and not (as here) with acts or conduct circumstantially probative of the agency relationship. In addition, it is a well established rule in Texas that an alleged agent's out-of–court acts or declarations may be admitted to prove the existence of the agency relationship once *prima facie* proof of the existence of that relationship has been made by means of other evidence—particularly where those acts are part of the "res gestae." *Ferguson v. Lewis,* 290 S.W. 858, 860 (Tex.Civ.App. 1927); 3 Tex.Jur.3d, Agency § 241 (1980).

ing of Heller's cattle business. R.IX: 966–67. In response, the court stated:

> ... I presume that this is impeachment, is that it?
>
> \* \* \* \* \* \*
>
> Let's go ahead. It is not going to hurt for the Jury to hear this testimony. If it is irrelevant they can disregard it. If they think it has anything to do with the case, they will consider it. And if I think it ought to be limited, I will instruct the Jury.

R.IX: 967.

The reading of the deposition to the jury showed testimony by Guss that he was not involved with Heller's cattle buying transactions and knew little about them beyond the identity of the feedlots from which Heller bought cattle. Guss testified that Heller had not introduced him to the operators of the various feedlots, that he did not travel with Heller on cattle buying trips, that Heller had not described the cattle buying activities to him, and that he did not know the specific details of Heller's cattle buying business. Nevertheless, he said, he knew "in general" how Heller operated. Over IBP's objections, the reading of the deposition continued and Guss's testimony revealed that he was aware of some details of Heller's cattle business from telephone conversations he had overheard. Guss stated that his "understanding" was that Heller bought cattle for IBP. He testified that he had formed this understanding from the fact that Heller spoke to IBP's Russ Walker four or five times a day, rather than from any direct statements by Heller to that effect.

On this appeal, IBP argues that the testimony of Timothy Guss should have been excluded as containing an inference insufficiently grounded in the personal knowledge of the witness, as irrelevant to the issue of actual agency, and as hearsay.

The Guss deposition itself is not barred by the hearsay rule, Fed.R.Ev. 804(b)(1), and is not challenged by IBP on that basis. IBP objects that it contains hearsay: specifically, Guss's statement that he inferred a relationship from the frequency of Heller's telephone conversations with IBP's Russ Walker. We disagree. The portions of the depositions read to the jury relate no out–of–court utterances, describe no assertive conduct, and are not, of course, offered to prove the truth of any assertions contained therein. Fed.R.Ev. 801(a), (c).

As a general rule, a lay witness must restrict his testimony, insofar as it involves the rendering of opinions or inferences, to those which are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed.R.Ev. 701. This rule has several elements, all of which must be present if the offered evidence is to be considered admissible. At the outset, there must be sufficient evidence to support a finding that the witness has personal knowledge of the facts from which the inference or opinion is said to derive. See Fed.R.Ev. 602; 3 Weinstein's Evidence ¶ 701[02], at 701–10 to –11. Next, there must be a rational connection between the opinion or inference and the observed factual basis from which it derives— that is, the opinion or inference must be one that a normal person would form from those perceptions. 3 Weinstein's Evidence ¶ 701[02], at 701–11. Finally, the opinion or inference must be helpful, either in understanding the testimony or in determining a fact in issue. Id. That the opinion or inference "embraces an ultimate issue to be decided by the trier of fact" does not affect its admissibility under Rule 701. Fed.R.Ev. 704 & Advisory Committee Notes.

[11] The role of judicial discretion in the application of Rule 701 is obvious:

> [T]he terms "fact" and "opinion" denote merely a difference of degree of concreteness of description or a difference in nearness or remoteness of inference. The opinion rule operates to prefer the more concrete description to the less concrete, the direct form of statement to the inferential.

McCormick on Evidence § 12, at 26 (2d ed.1972). But "[t]he basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact." Fed.R.Ev. Advisory Committee

Notes to Rule 704. Here, testimony by the business partner of Louie Heller that, on the basis of frequent daily telephone conversations between Heller and IBP's Russ Walker, he "understood" Heller to be buying cattle for IBP was admitted by the district court over the relevance and competency objections of IBP. To the extent that the objections raise the issue of admissibility under the lay opinion rule we conclude that the court determined in its discretion that the testimony met the requirements of that rule—"tenuous" as that evidence may have been. Guss's inference was predicated upon conduct he observed personally, the inference is one that a normal person might draw from those observations, and it is an inference that the district court could, in its discretion, consider helpful in the determination of a disputed fact—the nature of Heller's relationship to IBP. *See* Fed.R.Ev. 701. Thus, insofar as the strictures of the lay opinion rule are concerned, we find no error in the admission of this testimony.

▪ Nor can we say that the testimony is not relevant.[14] Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Ev. 401. This evidence has such a tendency as to both the actual and apparent agency issues, and its admission is therefore well within the discretion of the district court.

For these reasons, we find no error in the admission of the deposition of Timothy Guss.

(3) *The expert testimony of Eugene Redd.*

Eugene Redd, a livestock order buyer and cattle dealer, was called as an expert witness by the feedlots.

After lengthy testimony, Redd was asked about Louie Heller's reputation in the South Plains cattle industry. Over IBP's objections, Redd testified that in January and February of 1974 Heller was considered by "most of the people in the [South Plains cattle] industry" to be an order buyer for IBP. Redd was then asked on what facts he based his knowledge of Heller's reputation, and he responded that the bulk of Heller's cattle went to IBP. After a flurry of objections, Redd testified that he was closely associated with Heller's activities, buying from the same feedlots, dealing with the same people, and watching the movements of the cattle Heller procured.

On this appeal, IBP argues that Redd's testimony concerning Heller's general reputation as an order buyer (agent) for IBP was inadmissible under the substantive law of Texas to prove the existence of an agency relationship, and should have been excluded on that basis and on the grounds that it was hearsay. In addition, IBP notes that to whatever extent such testimony might have been admissible on the issue of apparent agency, the trial court erred in refusing to give a requested limiting instruction, restricting the jury's use of the testimony to the narrower purpose for which it was admissible.[15]

▪ The existence of an agency relationship cannot be proved by evidence of the alleged agent's general reputation as the agent of the alleged principal. *E. g., Deaton & Son v. Miller Well Servicing Co.,* 231 S.W.2d 944, 948 (Tex.Civ.App.1950); 3 Tex.Jur.3d, Agency § 239, at 328 & n. 23 (1980). Also, evidence of general reputation is often, although not always, inadmissible as hearsay:

14. We note IBP's general statements in briefing these evidentiary issues on appeal that, under the substantive law of agency in Texas, hearsay evidence, evidence of the alleged agent's reputation as the agent of the alleged principal, and the out-of-court declarations of the alleged agent are all incompetent to prove the existence of an agency relationship. Because we find that the testimony of Timothy Guss does

not fit into any of those categories, we do not discuss them.

15. At the close of the trial, IBP requested a general limiting instruction expressly restricting the jury's consideration of this portion of Redd's testimony, as well as other portions of the evidence, to the issue of apparent agency. This request was refused.

*Reputation* is a composite description of what the people in a community have said and are saying about a matter. A witness who testifies to reputation testifies to his generalized memory of a series of out–of–court statements. Whether the reputation is hearsay depends on the same tests ... applied to evidence of other particular out–of–court statements. Accordingly proof of reputation will often not be hearsay at all.

McCormick on Evidence § 249, at 595 (2d ed. 1972). Thus, if offered to prove the truth of the reputed assertions, reputation evidence would be inadmissible hearsay under Rule 802 of the Federal Rules of Evidence. But if offered for some other purpose, it would not be hearsay at all. Fed. R.Ev. 801(c); McCormick on Evidence, *supra*, § 249, at 595.

 Just such a situation is presented here. As to the fact of actual agency, the composite out–of–court utterances of the cattle industry recounted by Eugene Redd clearly constitutes hearsay, and is inadmissible under both the hearsay rule and

the rule embodied in *Deaton & Son v. Miller Well Servicing Co., supra.* As to the issue of apparent agency, however, evidence of reputation is not barred by the *Deaton* rule; further, being offered to prove elements of *apparent* agency,[16] as opposed to the fact of actual agency, it is clearly not hearsay. Thus, it is admissible for that purpose, which was an issue in the present case, although not admissible to prove *actual agency*.

In such circumstances, the Federal Rules of Evidence provide that the trial court shall, upon request, restrict the evidence to its proper scope and instruct the jury to that effect. Fed.R.Ev. 105. Thus, although the challenged evidence was clearly admissible, it should have been accompanied by a limiting instruction to the jury if IBP so requested in a timely manner.[17]

 The sense of the limited admissibility rule embodied in Rule 105 is that evidence which is properly admissible for one purpose should not be automatically excluded merely because it is inadmissible for another—the trial court is to weigh the pro-

---

**16.** Restatement (Second) of Agency § 27 Comment (a) (1958) (Italics ours):

For apparent authority there is the basic requirement that the principal be responsible for the information that comes to the mind of the third person.... Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such a belief.... *So, too, a person who permits another to do and act in such a way as to establish in a community a reputation for having authority to act, either by directing the agent so to represent, or by directing him to act and doing nothing to prevent the spread of such information by the agent or by others, creates apparent authority with respect to those who learn of the reputation.*

*See also id.* Comment (b) (Italics ours):

Until there has been a communication to a particular person, and until that person learns facts from which he reasonably infers that the agent is authorized, there is no apparent authority.... *Thus, if the agent has the reputation in a community of having authority so that as to all persons in the community he would have apparent authority,* he nevertheless has no apparent authority as to a stranger who does not know of the reputation....

**17.** IBP's request came during the discussion of the trial court's final instructions to the jury:

MR. ROTHE [for IBP]: I did add one other thing at the end, Your Honor.

THE COURT: Yes, sir, I saw that.

MR. ROTHE: In connection with issues 1 and 2, you are to consider only the words and conduct of Iowa Beef Processors and Heller between themselves, not what others may have heard or believed about the relationship. This is because it is the manifestation of the principal to the agent, their words and conduct among themselves, that has to be looked, not to hearsay, not to rumor, not to reputation—yes, those things may be relevant to apparent agency, but not to actual agency. And I am concerned about any washback because there is that type of evidence in the case.

THE COURT: This gets down to whether I am going to confine these instructions to 1 and 2 or let it go to just generally the agency issues.

MR. ROTHE: Yes, it does, Your Honor.

THE COURT: I'm going to let it go generally, gentlemen, and overrule those objections except as I have noted.

All right, let's go on to the next.

R.XI: 1186–87.

bative value of the evidence against the risks inherent in its admission to determine whether the evidence should be excluded [18] or admitted for its limited uses. *See* 1 Weinstein's Evidence, *supra*, ¶ 105[02]; 21 Wright & Graham, Federal Practice and Procedure: Evidence § 5063, at 311–14 (1977). Once the court determines that such evidence should be admitted, however, it cannot refuse a requested limiting instruction. 1 Weinstein's Evidence, *supra*, ¶ 105[01] at 105–4. Although generally more effective at the time the evidence is presented, limiting instructions may be requested and given as part of the court's final instructions to the jury, *id.* ¶ 105[01], at 105–34 to –35, and need not be given in the particular form or manner that is sought by the parties, so long as the general instructions sufficiently serve the limiting purposes of Rule 105. *See Fleming v. Michigan Mutual Liability Co.*, 363 F.2d 186, 189 (5th Cir. 1966); 1 Weinstein's Evidence, *supra*, ¶ 105[05], at 105–34.

For the purposes of this review, then, our task is to determine whether the instructions given by the district court, in combination with the court's comments upon the testimony of Eugene Redd, were sufficient to limit the jury's use of Redd's reputation testimony to the issue of apparent agency, and to muffle any echoes of that testimony that might have influenced the jury's deliberations on the issue of actual agency.

We find that the court's instructions, tied into the presentation of the special interrogatories to the jury, adequately delineate, define, and distinguish the actual and apparent agency issues for the benefit of the jury. What they do not do, however, is adequately instruct the jury to restrict its use of Eugene Redd's testimony as to Heller's reputation to the purposes (apparent agency) for which it was properly admissible. In that light, they cannot be said to constitute the mandatory limiting instructions envisioned by Rule 105.

For this reason, we must conclude that the admission of that portion of the testimony of Eugene Redd describing Heller's general reputation in the South Plains cattle industry was in error, although we ultimately hold it to be harmless.[19]

### (4) *The testimony of Henry Winter and Jay Crofoot.*

Henry Winter was the manager of Lockney and Jay Crofoot was the manager of Lubbock.

Each testified over IBP's objections concerning their beliefs at the time of the transactions in question about the nature of Heller's relationship to IBP.

Winter testified that based upon his prior dealings with Louie and Jay Heller and the fact that Heller had purchased between one and two thousand cattle from Lockney, all of which were shipped to IBP, he believed Heller to be an order buyer (agent) for IBP. He testified further that IBP had never done anything to dispel that belief, and that he would not have sold to Heller had he thought Heller was buying for his own account without first inquiring into how Heller would pay.

Similarly, Jay Crofoot, Lubbock's manager, testified over IBP's objections that, on the basis of his past associations—telephone calls Heller made from the Lubbock feedlot, Lubbock's arrangements for shipping the cattle purchased by Heller, the volume of cattle sold and the regularity of the sales to Heller, and his own conversations with employees of IBP—he believed Heller to be buying on order for IBP. Crofoot went on to testify that he would not have sold the cattle to Heller had he believed Heller to be buying for his own account, and that IBP had done nothing to dispel his belief that Heller was its agent.

On this appeal, IBP argues that the testimony of Henry Winter and Jay Crofoot as to their beliefs concerning Louie Heller's

---

**18.** *See* Fed.R.Ev. 403; *id.*, Advisory Committee Notes to Rule 105.

**19.** *See* Fed.R.Civ.P. 61. This question will be addressed in Part B of this discussion of the sufficiency of the evidence to support the jury's finding of actual agency.

relationship to IBP "should not have been considered by the jury on the actual agency issue." The argument appears to be grounded on a contention that the challenged evidence is not probative of actual agency, although the precise theory and basis for exclusion is less than clear to us.[20]

■■■■ On its face, the notion of relevancy in the Federal Rules of Evidence does not seem to contemplate an issue–by–issue consideration of the relevance of any given piece of evidence:

> "Relevant evidence" means evidence having any tendency to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence.

Fed.R.Ev. 401 (Italics supplied).

> All relevant evidence is admissible, except as otherwise provided.... Evidence which is not relevant is not admissible.

*Id.* 402. Thus, if probative of *"any* fact that is of consequence to the determination of the action," evidence is relevant within the meaning of the Federal Rules, and is therefore admissible. Notwithstanding its relevance, however, evidence can be excluded in the discretion of the district court if the court first determines that

> its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Id.* 403; 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5221, at 309–10 (1978). Thus, when evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401—it must be without probative value as to *any* fact of consequence to the determination of the action. If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402.

In strict terms, therefore, the mandatory instruction as to limited admissibility required by Rule 105 does not appear to apply in the "limited relevancy" situation. Rule 105 is designed to operate in the context of evidence that is *admissible* for one purpose but *inadmissible* for another. But relevance is not defined in terms of the purpose for which the evidence is offered—it is defined in terms of its probative value within the action as a whole. Once a given piece of evidence has been found probative of *any* fact that is of consequence to the determination of the action, it is found relevant; and, insofar as its relevance is concerned, it is not inadmissible at all. In these circumstances, it is Rule 403 with its *discretionary* power to exclude (and its implicit power to *limit*) evidence in order to prevent prejudice, confusion, or waste of judicial resources, and not Rule 105 with its *mandatory* provision for limiting instructions, that is applicable: Parties may not invoke the limited admissibility rule of Rule 105 in the "limited relevancy" situation to *require* a trial court to erect a system of evidentiary pigeonholes into which sundry bits of evidence must be sorted according to an issue–by–issue assessment of its relevance.

■■■ From this perspective it is clear that the district court did not err in *admitting* the testimony of Henry Winter and Jay Crofoot. Relevant to the issue of apparent agency, that testimony was relevant

---

20. In its brief to this court, IBP characterizes the challenged testimony generally as "grossly self-serving," as insufficiently predicated in fact, and as hearsay. The plaintiff feedlots respond simply that the testimony in question is not hearsay.

The feedlots are correct. Whatever else this testimony might be, it is not hearsay. Fed. R.Ev. 801(a), (c). Nor is its factual basis so insubstantial, or its contribution to the determination of facts and issues so minimal, that it falls afoul of the lay opinion rule. Fed.R.Ev. 701; *see id.* 704, 601. Nor, finally, are we referred to any provision of the applicable substantive law of Texas that would stand as a direct barrier to the admission of this testimony on the actual agency issue—as, for example, would be evidence of the reputation and the out–of–court declarations of the alleged agent.

Only the irrelevance of this testimony in general terms remains as a viable ground for exclusion.

to the action as a whole under Rule 401 and was therefore admissible under Rule 402. Nor did it present the dangers of prejudice, confusion, or waste of judicial resources to a degree sufficient to outweigh its probative value and thereby give rise to the discretionary exclusionary power of Rule 403. In addition, we can find no fault in the district court's refusal to give the limiting instruction requested by IBP.[21] Our reading of the court's general instructions to the jury persuades us that whatever minimal risk of prejudice, confusion, or "washback" might have been raised by this testimony was thereby adequately defused.

For these reasons, we find no error in the district court's admission of the testimony of Henry Winter and Jay Crofoot.

### B. The Sufficiency of the Evidence

IBP argues on this appeal that the evidence adduced at trial was insufficient to support the jury's finding that Louie Heller was acting as the agent of IBP in the transactions at issue in this case.

In this circuit, the sufficiency of the evidence to support the submission of a case to the jury for the jury's subsequent verdict will not be reviewed on appeal unless the party seeking review has moved for a directed verdict at the close of the evidence in the district court. *Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 510–11 (5th Cir. 1970).

IBP did so move, on the ground, *inter alia*, that the evidence adduced was insufficient. R.II: 451; R.X: 1161. That motion was denied. The case was submitted to the jury, which responded to special interrogatories to find that, from a preponderance of the evidence, James Louie Heller was acting as the agent of IBP in purchasing the cattle in question from the Lubbock and Lockney feedlots. The jury entered a verdict favorable to the feedlots on every factual issue presented, and on the basis of that verdict, the district court entered judgment in favor of the feedlots. IBP immediately moved in the alternative for a judg-

ment notwithstanding the verdict or for a new trial. R.III: 516. Both motions were denied. R.III: 602.

This challenge to the sufficiency of the evidence to support the jury's findings raises two discrete questions, and implicates a third. At the outset, we must determine whether the district court was correct in its denial of IBP's motion for a judgment notwithstanding the verdict. At bottom, the question is whether the evidence was sufficient to have warranted the submission of the case to the jury. *See Boeing Co. v. Shipman*, 411 F.2d 365, 367 (5th Cir. 1969) *(en banc)*. The standard against which we must assess the district court's determination is that set out in *Boeing, supra*:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non–mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair–minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh con-

---

21. *See* note 17 *supra.*

flicting evidence and inferences, and determine the credibility of witnesses. 411 F.2d at 374–75.[22]

■ Should we uphold the denial of the motion for judgment notwithstanding the verdict, we must then address the district court's denial of IBP's motion for a new trial. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2540, at 617 (1971). The question of the sufficiency of the evidence in the judgment n. o. v. context is a question of law in the resolution of which the district court has no discretion; in the motion for new trial situation, however, the district court enjoys a broad discretion, and its order will not be disturbed on appeal without a clear showing that this discretion has been abused. Thus, the standard of review in this latter situation differs from that set out in *Boeing, supra.* At bottom, the standard employed by the district court in its initial determination is whether the verdict goes against the weight of the evidence. On appeal, however, it is the discretion of the district court that takes on central importance:

> [T]he operative factors underlying review of a ruling on a new trial motion are deference to the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, deference to the jury's determination of weight of the evidence and quantum of damages, and the constitutional allocation to juries of questions of fact.... [W]here the judge denies the motion and leaves undisturbed the jury's determination, all factors press in the direction of leaving the trial judge's ruling undisturbed....

*Massey v. Gulf Oil Corp.,* 508 F.2d 92, 94–95 (5th Cir. 1975), *quoted in Valley View Cat-*

*tle Co. v. Iowa Beef Processors, Inc.,* 548 F.2d 1219, 1220 n. 2 (5th Cir. 1977).

Finally, running throughout our inquiry on the issue of the sufficiency of the evidence is the question of harmless error. Under the Federal Rules of Civil Procedure, error is to be disregarded on appeal unless to do so would be "inconsistent with substantial justice," or unless the error has affected the substantial rights of the parties. Fed.R.Civ.P. 61. Thus is the "riddle of harmless error"[23] posed to the federal courts. And, having found error in the district court's admission of the testimony of Eugene Redd without the limiting instruction mandated by Rule 105 of the Federal Rules of Evidence, thus also is that riddle posed to us.

The question of harmless error is inseparable from that of the sufficiency of the evidence to support the finding or verdict the erroneously admitted evidence went toward proving. For if, without it, the remaining evidence is insufficient to support the final result, the error cannot be said to have been harmless. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2885, at 289–90 (1973). Recognizing this, IBP couches its argument in precisely those terms. For this reason, we shall exclude that testimony from our consideration of the sufficiency of the evidence to support the jury's findings on the issue of actual agency.

■ Under Texas law, agency is a legal relationship created by the express or implied agreement between the parties, or by operation of law, under which the agent is authorized to act for and on behalf of the principal, and subject to the principal's control. *Sorenson v. Shupe Bros. Co.,* 517 S.W.2d 861, 864 (Tex.Civ.App.1974); *Tar-*

---

**22.** On appeals such as this one, the procedural posture in which the question is raised is not material:

> Whether the evidence is sufficient to create an issue of fact for the jury is solely a question of law to be determined by the Court. The standard in passing on that question is the same whether it arises in the procedural context of a motion for·directed verdict or of

a motion for judgment notwithstanding the verdict. It is the same in the trial court and upon appeal.

9 Wright & Miller, Federal Practice and Procedure: Civil § 2524 (1971). *See Boeing Co. v. Shipman,* 411 F.2d 365, 367 n. 1 (5th Cir. 1969) *(en banc).*

**23.** R. Traynor, The Riddle of Harmless Error (1970).

ver, *Steele & Co. v. Pendleton Gin Co.*, 25 S.W.2d 156, 158 (Tex.Civ.App.1930); *Valley View Cattle Company v. Iowa Beef Processors, Inc.*, 548 F.2d 1219, 1221 (5th Cir. 1977).

In determining the existence of an agency relationship in the context of the present case, where the alleged agent purchases property that it subsequently passed on to the alleged principal, the courts of Texas have adopted the rules set out in the Restatement (Second) of Agency:

> One who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself.

Restatement (Second) of Agency § 14K (1957).

> Factors indicating that the one who is to acquire the property and transfer it to the other is selling to, and not acting as agent for, the other are: (1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property. None of these factors is conclusive.

*Id.* Comment (a), *quoted in Valley View Cattle Co. v. Iowa Beef Processors, Inc.*, 548 F.2d at 1221; *American Employers Insurance Co. v. Kilgore*, 412 S.W.2d 67, 69 (Tex. Civ.App.1967).

▇ Our initial task, then, is this: To review all the evidence presented in this case (with the exception of the erroneously admitted testimony of Eugene Redd concerning the general reputation of Louie Heller) to determine whether, viewed in the light and with all reasonable inferences most favorable to the feedlots, the facts and inferences point so strongly and overwhelmingly in favor of IBP that reasonable jurors could not arrive at a contrary verdict; or whether, on the contrary, there is substantial evidence such that reasonable and fair–minded jurors in the exercise of impartial judgment might reach a different conclusion. *Boeing Co. v. Shipman*, 411 F.2d at 374. Our review must be conducted in the context of the legal elements of the principal–agent relationship as outlined above, with particular reference to the "primarily for the benefit" test of Section 14K of the Restatement, and the agency–negating indicia delineated in the Comment to that section. When viewed from that perspective, the evidence persuades us that reasonable persons could draw contrary conclusions from the evidence adduced at trial, and for that reason we must affirm the district court's denial of IBP's motion for judgment notwithstanding the verdict.

The evidence shows a long and well–established relationship between Heller and IBP. They had been treating with each other for some eight years prior to the sales in question here. Heller was in daily contact with IBP, obtaining such information as the number and quality of the cattle desired by IBP, the price IBP would pay therefor, and the price Heller himself should pay. As between IBP and Heller, Heller had a fixed, exclusive territory to which he was restricted and within which he suffered no competition for the favor of IBP. The great bulk of the total number of cattle purchased by Heller found their way to IBP. Heller's buying practices fluctuated according to the expressed needs of IBP and not according to the fluctuation of market price. Although his operations were not free from risk, the risk was not that normally associated with the independent speculator who buys low in the hope of later selling high—Heller knew what he would get before he bought. Heller received large advances from IBP, an unusual practice between packers and independent cattle buyers. Heller had railroad cars on lease for the purpose of shipping cattle to IBP's Emporia, Kansas, plant—again, an unusual practice for an independent dealer. During the 1973 price freeze, Heller appears to have sold his cattle directly to IBP's customers at IBP's request or direction.

Also during that price freeze, an IBP employee, Pat Henry, appears to have been "loaned" to Louie Heller. Heller had left instructions with some feedyards to call IBP with information concerning each day's purchases.

There is also evidence tending to counter that from which an agency relationship might be inferred. It is clear that the feedlots in question here dealt directly with Heller, and never with IBP. They expected, and (when they received payment at all) they received, their payment from Heller rather than IBP. All the documents generated during the sales name Heller, not IBP, as the purchaser. The feedlots first sought redress from Heller alone, and only upon their inability to collect from him did they turn to IBP. Heller always received a fixed price from IBP, regardless of the price he paid for the cattle. There is some evidence that the feedlots viewed Heller as an independent cattle buyer and not as IBP's agent. And finally, Heller did conduct, at least as to packers other than IBP, an independent business in buying and selling cattle.

Thus, as in the earlier *Valley View* case, the evidence here adduced gravitates in two directions. IBP argues that the evidence tracking the agency–negating indicia set out in the Restatement precludes the district court's finding of sufficient evidence to create a jury question. We disagree. Our task here is to determine whether the evidence, taken as a whole and in the light most favorable to the feedlots, is such that reasonable persons might reach a conclusion contrary to that urged by the party seeking to avoid the jury's verdict. The evidence here is substantially identical to that adduced in *Valley View*. And, like the panel in *Valley View*, we cannot say that the

facts and inferences point so strongly in favor of IBP that reasonable jurors could not reach a contrary conclusion.

Nor can we, on a cold record and in light of the constitutional allocation to juries of questions of fact, conclude that the district court abused its broad discretion in determining, in the context of a living trial, that the jury's verdict should be left undisturbed. No more than the panel in *Valley View* do we sit as thirteenth jurors.

Further, we find the district court's error in admitting the testimony of Eugene Redd concerning the general reputation of Louie Heller as the agent of IBP to have been harmless. As Professor Wright has noted, "Claims of error with regard to the admission or exclusion of evidence are prime candidates for application of the harmless error rule." 11 Wright & Miller, Federal Practice and Procedure: Civil § 2885, at 282 (1973). In light of our determination that the evidence was sufficient to support the jury's finding of an agency relationship even without the challenged testimony, in view of the relatively minor importance of the inadmissible matter, and in light of the district court's general instructions to the jury, we conclude that the inadmissible matter had no prejudicial impact upon the final outcome of this case. Fed.R.Civ.P. 61.

For these reasons, we affirm the district court's denial of IBP's motions for judgment n. o. v. and for a new trial.

### 4. *Apparent Agency*

Because we affirm the judgment of the court below on the issue of actual agency, it is unnecessary for us to address IBP's challenges to the sufficiency of the evidence to support the jury's findings on the issue of apparent agency.[24]

---

**24.** Similarly, we need not address IBP's contention that the feedlots failed to exercise due diligence to ascertain Heller's true relationship with IBP. The feedlots' diligence in this regard may well have substantial impact upon their right to recover under a theory of apparent agency, but it has no readily apparent bearing on the question of actual agency. The liability of a principal in these circumstances turns ultimately upon the objective existence of a consensual arrangement between the principal and his agent, and not upon what third parties believed, or learned, or failed to try to learn about that relationship.

### 5. Equitable Estoppel

IBP argues on this appeal that the feedlots should be estopped from pursuing this remedy against IBP because they extended unusually liberal payment terms to Heller and thereby caused their own losses. At bottom, IBP urges what may be called the "two innocents" rule: Where a loss must be allocated to one of two innocent parties, it should equitably fall to that party who could have, but who failed to, prevent the loss.

In its response to the special interrogatories posed by the district court, the jury found specifically that the feedlots had failed to require Heller to make prompt[25] payment for the cattle, but that this failure was neither negligent[26] nor the proximate cause[27] of the feedlots' loss.

In support of its position, IBP argues that these findings of the jury are inherently inconsistent and not supported by the evidence, and that the feedlots' failure to require prompt payment was both negligent and the proximate cause of the loss. Further, relying on the Eighth Circuit case of *Farm Bureau Co–operative Mill and Supply, Inc. v. Blue Star Foods, Inc.*, 238 F.2d 326, 335–36 (8th Cir. 1956), IBP argues that the "two innocents" rule should operate as an estoppel against the feedlots even if Heller was the actual agent of IBP, since Heller was acting outside the scope of his authority in failing to use the funds provided by IBP to pay the feedlots.

The liability of a principal to third parties with whom his agent deals is predicated on the notion that the authorized acts of the agent are the acts of the principal himself. *Lucas v. Whitely*, 550 S.W.2d 767, 769 (Tex.Civ.App.1979); 3 Tex.Jur.3d, Agency §§ 1, 169 (1980). This rule is bottomed on a recognition that, since the principal places the agent in the position of dealing with third parties, thereby making it possible for the agent to injure them, the principal must be seen as warranting the fidelity and good conduct of the agent within the perimeter of his actual or apparent power. *Bankers Life Insurance Co. v. Scurlock Oil Co.*, 447 F.2d 997, 1006 (5th Cir. 1971). But a principal is not bound by every act of his agent. For example, where the agent has exceeded the scope of his authority in treating with a third party, the principal will be bound unless the third party has not exercised due diligence to ascertain the true extent of the agent's authority. *Prowse v. Whitehurst*, 313 S.W.2d 126, 130 (Tex.Civ.App.1957).[28] In addition, where the third party has extended credit exclusively to the agent alone—with no intention of extending credit also to the principal—only the agent is bound on that transaction. *Elwell v. Tatum*, 6 Tex.

---

**25.** The district court, in its instructions to the jury, defined the term "promptly" as follows:

In answering [the special interrogatories] the term "promptly" means the course of action that a reasonably prudent person, operating a feed yard in this geographical area, being similarly situated and with like knowledge, would take under the same or similar circumstances.

R.XI: 1225.

**26.** The district court defined "negligence" as follows:

Now, in answering [these special interrogatories] the term "negligence" ... means a failure to use ordinary care; that is to say, failure to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

R.XI: 1226.

**27.** The district court defined "proximate cause" as follows:

Also, in the above special issues, the term "proximate cause" means that cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces an event and without which cause such event would not have occurred. And in order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event or some similar event might reasonably result therefrom. There may be more than one proximate cause of an event.

R.XI: 1226–27.

**28.** This is no more than the requirement that a third party must have *reasonably* relied on the apparent authority of an alleged agent in order to recover upon that theory. *See* note 24 *supra*.

Civ.App. 397, 24 S.W. 71, 76 (1893).[29] Furthermore, if the agent has acted adversely to the interests of his principal, to the knowledge of a third party contractant, the principal may not be bound. *Sanders v. Elberta Fruit Co.*, 190 S.W. 817, 818 (Tex. Civ.App.1916).[30] In these, and conceivably in other, situations a kind of estoppel is erected to protect the principal from liability. But none involves a situation in which the principal is protected from liability where his agent has acted within the scope of his authority and the third party has contracted in good faith.

That is the situation in the present case. The jury found, and we have affirmed, that Heller was authorized by IBP to act on its behalf in the transactions here in question. Once that finding is established, there can be no basis for estoppel. Heller acted as the jury found he was authorized to act. He contracted with the feedlots for the purchase of the cattle. It is those contracts upon which IBP's liability is predicated. It is IBP which chose to utilize Heller as the agency through which the purchases would be made, and as the conduit through which the price would be delivered to the sellers. And it is IBP which must answer for Heller's failure to fulfill those duties.

The feedlots' accommodation of Heller in not requesting prompt payment was specifically found by the jury to have been neither negligent nor a proximate cause of the subsequent losses. We find no inconsistency in those findings. The jury recognized the extension of time as a deviation from the normal practice in the industry, but found that it did not constitute a failure to use ordinary care, and that it was not reasonably foreseeable that nonpayment would thereby result. Further, we find substantial evidence in the record which, when taken in context and in the light most favorable to the feedlots, would allow reasonable and fair-minded persons in the exercise of impartial judgment to reach the conclusions that were in fact reached.[31] Nor did that accommodation constitute an extension of credit by the feedlots to Heller sufficient to demonstrate an intention to bind only Heller, and not IBP, on the transactions in question. This precise issue was not presented among special interrogatories to the jury; since its omission was not objected to, and because a contrary finding would be manifestly inconsistent with the verdict below, the district court must be deemed to have found that no such credit extension occurred. Fed.R.Civ.P. 49(a). That deemed finding is amply supported in the record,[32] and we affirm it.

Finally, regardless of the extent to which the "two innocents" doctrine might or might not be applicable in the agency context generally,[33] it is nevertheless inapplica-

29. This is no more than the rule that a principal is not bound on a contract to which he was not intended to be a party.

30. This is no more than an application of the rule that a principal is bound only where his agent acts within the scope of his authority.

31. There was evidence that the feedlots did not know when Heller was paid by IBP. There was evidence that IBP, on occasion, had not paid so promptly in the past. And there was evidence that IBP may have caused, or contributed to, the loss by paying Heller earlier than was the custom in the industry.

32. There was substantial testimony that it was the universal custom in the industry—custom under which these parties operated—that all such sales were for cash.

33. IBP's authority for contending that the rule is applicable is *Farm Bureau Co-operative Mill & Supply, Inc. v. Blue Star Foods, Inc.*, 238 F.2d 326 (8th Cir. 1956). As the feedlots correctly point out, the case is inapposite for a number of reasons. First, it is, of course, not applying Texas law. Second, it does not involve an agency situation, and thus its discussion of that situation is at best a dictum. Finally, it deals with a situation in which—on facts very like those in the present case—payment was made by the "principal" by means of a sight draft drawn on the "principal" and made payable to the plaintiff third party seller. The plaintiff third party endorsed the sight drafts in blank. The endorsed sight drafts were subsequently obtained by the "agent," cashed, and placed in his personal account. On these facts, the court held that the third party's endorsements were negligent. The court went on to say that even if the "agent" were an agent in fact, still the third party could not recover from the principal, since the agent's fraud could not be imputed to the principal.

ble in the instant case: means for preventing the loss were at least as readily available to IBP, which, as principal, selected and controlled Heller as the conduit for payment, as to the feedlots, which merely forebore from dunning Heller as early as they might have.

For these reasons, we find no basis for an estoppel in the present case.

### 6. Election of Remedies

IBP argues on this appeal that the feedlots are barred by the Texas doctrine of election of remedies from pursuing this action against IBP.[34]

The Texas doctrine of election of remedies reflects the considered policy of that state:

[A] claimant should not be permitted to assert formally the existence of one state of facts in a claim against one party and accept complete or partial satisfaction of that claim, and then maintain an action against another party on the ground that the facts first asserted did not exist. We conclude that the supreme court ... has given controlling weight to this latter consideration.

*Ward v. Shriro Corp.*, 561 S.W.2d 589, 591–92 (Tex.Civ.App.) *rev'd on other grounds*, 570 S.W.2d 395 (Tex.1978). It is the inconsistency that gives rise to the doctrine's operation as a bar. *Shriro Corp. v. Ward*, 570 S.W.2d 395, 397 (Tex.1978).

Although the approach has been criticized, Texas courts have long found such inconsistency of remedy in the *undisclosed* agency situation. *Sherill v. Bruce Advertising, Inc.*, 538 S.W.2d 865, 867 (Tex. Civ.App.1976). "[W]here the third party

has no notice that the agent is acting as such for a principal, the agency and the principal are regarded as 'undisclosed'." 3 Tex.Jur.3d, Agency § 196 at 269 (1980). Thus, when a third party contracts with the agent of an undisclosed principal, and subsequently seeks to recover on that contract, he faces the election doctrine: If he learns the identity of the undisclosed principal before he recovers judgment against the agent, he will be required to elect whether to proceed to judgment against the agent or to seek recovery from the principal. *Sherill v. Bruce Advertising, Inc.*, 538 S.W.2d at 867; 3 Tex.Jur.3d, Agency § 215 (1980). Once judgment is recovered against the agent by one who knows the identity of the undisclosed principal, the principal is discharged from liability. *Sherill v. Bruce Advertising, Inc.*, *supra*, 538 S.W.2d at 867; 3 Tex.Jur.3d, Agency § 215 (1980); Restatement (Second) of Agency § 210(1) (1957).

However, as IBP concedes in brief, "[t]he election of remedies rule upon which IBP relies applies only to '*undisclosed*' principals." P. 39 (Italics supplied). Apparently, suit against either the agent or his disclosed (or partially disclosed) principal is not regarded as pursuing remedies which are inconsistent with one another. *Cf.* 3 Tex. Jur.3d, Agency § 214 (1980). Thus, where both the existence of the agency and the identity of the principal are known to the third party when the contract is made (disclosed agency) or where the existence of the agency alone is known (partially disclosed agency), the recovery of judgment against the agent does not constitute an election of remedies that will bar a subsequent suit

---

34. As the feedlots correctly note, election of remedies is an affirmative defense that must be pleaded. *Bradley v. Straus–Frank Co.*, 414 S.W.2d 504, 510 (Tex.Civ.App.1967); Fed.R. Civ.P. 8(c). IBP did not so plead. R.I: 14. IBP moved under Fed.R.Civ.P. 15(b) to amend its pleadings to conform to the evidence by including the affirmative defense of election of remedies. R.II: 459. The feedlots contend that the district court denied that motion. *See* R.I: 364. However, IBP's subsequent motion in the alternative for judgment notwithstanding the verdict or for a new trial included the elec-

tion argument. R.III: 516. The feedlots objected in response to that motion that the election of remedies defense had not been pleaded. R.III: 554. The district court did not rely on the untimeliness of IBP's motion to amend, however; instead, the court addressed the merits of the election defense, rejecting it as inapplicable on the evidence at hand. R.III: 603.

We take this to mean that the court below did not deny IBP's motion to amend its pleadings under Rule 15(b), but rather that it granted it. *See* Fed.R.Civ.P. 15(a), (b).

against the principal. Restatement (Second) of Agency § 184 & Comment (a) (1957); see id. § 185.[35]

In its response to the special interrogatories propounded by the district court, the jury expressly found, first, that Heller and IBP had represented to the feedlots, through their conduct or statements before the completion of the transactions in question, that Heller was the agent of IBP, and second, that the feedlots reasonably believed that such an agency existed. On the strength of those findings, the district court concluded that IBP was not an undisclosed principal and on that ground rejected IBP's election—of—remedies argument as a basis for judgment n.o.v. or for a new trial. R.III: 603.

As it must, IBP challenges the district court's conclusion that IBP was not an undisclosed principal. IBP contends that a principal is undisclosed unless his identity is disclosed by the agent or the principal, or unless the third party *knows* thereof from other reliable sources. Characterizing the

court's reliance upon the jury's express finding as misplaced and as a confusion of the issue of apparent agency with the question of whether the agency was disclosed or undisclosed, IBP contends that the evidence is insufficient to support the court's conclusion.[36]

■■■■ We find no error in the district court's conclusion of law that IBP was not the undisclosed principal of Louie Heller in these transactions. A principal is disclosed if, at the time of the transaction conducted by his agent, the third party contractant has notice of the existence of the agency relationship and of the identity of the principal. Restatement (Second) of Agency § 4(a) (1957). A principal is partially disclosed if at the time of the transaction the third party has notice of the existence of the agency relationship, but not the identity of the principal. *Id.* § 4(2). "Notice" is rather broad in scope:

The [third party] has notice of the existence or identity of the principal if he knows, has reason to know, or should

---

**35.** Restatement (Second) of Agency § 184(1) (1958) provides:

Recovery of judgment against the agent of a disclosed or partially disclosed principal for failure of performance of a contract to which the agent is a party does not thereby discharge the principal unless the agent and principal were joint contractors.

Comment (a) explains:

The rule stated in this Subsection is not in accord with the rule stated in Section 210 dealing with the undisclosed principal. The cases holding that a person who gets judgment against the agent after discovery of the identity of the undisclosed principal can not later get judgment against the principal, proceed upon the theory that this act indicates conclusively an election to hold the agent rather than the principal. But there is no room for a doctrine of election in the case of the disclosed or partially disclosed principal. In this case, the third person has a contract with the principal unless he chooses the sole responsibility of the agent *at the time of making the contract.* If he so elects, he cannot later hold the principal. If he does not so elect and if the agent is a party to the contract together with the principal, he does not have alternative contracts, as may be the result in the case of the undisclosed principal, but either a joint contract with the agent

and principal or a separate contract with each. (Italics ours.)

**36.** Apparently, IBP seeks in this matter to divorce its election-of--remedies argument from its earlier challenge to the sufficiency of the evidence to support the jury's findings of apparent agency, and thus to insure that the election defense would survive the defeat of that earlier challenge.

At bottom, the argument appears to be that the district court erred in concluding that the jury had resolved the "disclosure" question against IBP, and that the evidence is insufficient at any rate to support a factual finding that the feedlots had notice of IBP's identity.

For the conceptual purposes of this review, we are inclined to view the district court's conclusion that the jury had found a disclosed agency as a conclusion of law, and to view IBP's evidentiary challenge as one directed against the jury findings of fact upon which the court's conclusion was based.

In Part 4 of this opinion, we pretermitted the evidentiary challenge to the jury's findings on the apparent agency issues. We do not here resume what we suspended there. Our inquiry here is limited to the narrower question of whether there was sufficient evidence to support a jury finding that the plaintiff feedlots had notice of IBP's identity.

know of it, or has been given a notification of the fact.

*Id.* Comment (a).

Ordinarily, the third person derives his knowledge ... from the agent or principal in the transaction with them, but his legal relations with the principal are not altered by the source of his knowledge.

If the manifestations of the principal or agent are such as reasonably to indicate to the other party the identity or existence of the principal, the latter is disclosed or partially disclosed, and this is true although the other party believes that he is dealing with the agent alone.... If the manifestation as to agency is ambiguous, the belief of the other party, if reasonable, is conclusive.

*Id.* Comment (d). *See also id.* § 9 & Comments thereto. Texas has adopted these definitions, *see* 3 Tex.Jur.3d, Agency § 196 (1980), and in their light, the district court was clearly correct in determining that the jury had found notice of IBP's identity as the principal of Louie Heller.

But IBP challenges as well the sufficiency of the evidence to create a jury question on this issue, or to support the resolution of the question once it was presented to the jury.[37] Reviewing all the evidence, but in the light and with all reasonable inferences most favorable to the plaintiff feedlots, we cannot find that the facts and inferences point so strongly and overwhelmingly in favor of IBP that reasonable and fair-minded jurors could not conclude that the feedlots had notice of the existence of the agency and of the identity of IBP as Heller's principal. *See Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (*en banc.*) Both feedlot managers testified that they so believed on the basis of their past dealings with Heller. There was, in addition, testimony that the feedlots knew that the great bulk of Heller's "purchases" found

their way to IBP and that Heller was generally reputed in the South Plains cattle industry to be the agent of IBP.

That same evidence precludes, as well, any conclusion by this court that the district court abused its very broad discretion as to denying a new trial, by determining that the jury's findings in this regard did not conflict with the great weight of the evidence. *See Massey v. Gulf Oil Corp.*, 508 F.2d 92, 94–95 (5th Cir. 1975).

For these reasons, we conclude that the Texas doctrine of election of remedies was properly rejected by the district court as a basis for judgment n.o.v. or a new trial.

### 7. *Prejudgment Interest*

Finally, IBP challenges the propriety of the district court's award of six percent prejudgment interest to the feedlots. Citing the Texas case of *Pickens v. Alsup*, 568 S.W.2d 742 (Tex.Civ.App.1978), IBP contends that, since there was a good faith dispute between the parties regarding ultimate liability, prejudgment interest should not have been awarded.[38]

Under Texas law, the recognized test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery—not necessarily the amount of the damages—is fixed by conditions existing at the time the injury arose. *Pickens v. Alsup*, 568 S.W.2d at 743; *Dallas–Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc.*, 623 F.2d 1032, 1040–41 (5th Cir. 1980).

Here, the measure of recovery was fixed by conditions existing at the time the injury arose: The feedlots were entitled, upon delivery of the cattle, to receive the purchase price for those cattle, less any amount by which the feedlots' claim was satisfied in its action against the agent.

---

**37.** *See generally* Part 3 B of this opinion, *supra.*

**38.** In addition, IBP argues that either a written contract acknowledged by the party to be charged, or a jury finding that interest was an element of the damages, is a prerequisite to the award of prejudgment interest under Texas law. IBP cites no authority for this proposi-

tion. Be that as it may, it is clear from the record that neither side requested the submission of any damage issues, or objected to the non-submission of such issues, to the jury. Thus, the findings of the district court govern. Fed.R.Civ.P. 49(a).

IBP's reliance on the *Pickens* case is misplaced. *Pickens* does not hold, as IBP suggests, that prejudgment interest is improper whenever there exists a good faith dispute over whether the defendant is liable for the recovery sought—such disputes are inherent in virtually every lawsuit. *Pickens* stands for the proposition that prejudgment interest is improper where the good–faith dispute is such that the *measure* of damages remains a question for the court or the jury to resolve. *Travelers Indemnity Co. v. Pollard Friendly Ford Co.*, 512 S.W.2d 375, 383–84 (Tex.Civ.App.1974), *cited in Pickens v. Alsup*, 568 S.W.2d at 744; *Dallas–Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc.*, 623 F.2d 1042, at 1041, *quoting Travelers Indemnity Co. v. Pollard Friendly Ford Co., supra.*

As the panel in the *Dallas–Fort Worth* case noted, no such uncertainties cloud the measure–of–recovery issues in the present case. Prejudgment interest is allowable "where an ascertainable sum of money is determined to have been due and payable at a date certain prior to judgment." *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 116 (Tex.1979).

For this reason, we find no error in the district court's award of prejudgment interest.

### Conclusion

In sum, we hold that the plaintiff feedlots are the real parties in interest in this action within the meaning of Fed.R.Civ.P. 17(a), and thus have standing to bring this action. We reject the appellant's invitation to overrule this court's earlier decision in *Valley View Cattle Co. v. Iowa Beef Processors, Inc.*, 548 F.2d 1219 (5th Cir. 1977). We hold that although the district court erred in admitting the general reputation testimony of Eugene Redd without a limiting instruction, that error was harmless. We hold that in all other respects the challenged evidentiary rulings of the district court were without error. We hold that the evidence was sufficient to create a jury question on the issue of actual agency, and

that the district court did not err in determining that the jury's verdict on that issue was not against the weight of the evidence. We hold that there is no basis upon which the plaintiff feedlots might be equitably estopped from asserting their claims against the appellant in this action. We hold that the Texas doctrine of election of remedies is not applicable on the facts of this case. And finally, we hold that the district court's award of six percent prejudgment interest was free from error.

The judgment of the district court is therefore

AFFIRMED.